Bennie E. SMITH, on behalf of himself and other persons similarly situated, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Civ. A. No. 17499.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 3, 1975.

E. Lundy Baety, Hill, Jones & Farrington, Atlanta, Ga., for plaintiff.

Melburne D. McLendon, Carter, Ansley, Smith, McLendon & Quillian,

Atlanta, Ga., Kalvin M. Grove, Lederer, Fox & Grove, Chicago, Ill., Robert A. Penney, Boston, Mass., for defendant.

## ORDER

JAMES C. HILL, District Judge.

This matter came on for pre-trial hearing on May 8, 1975.

Pending are: Defendant's motion to dismiss the claim of discrimination based upon sex; and plaintiff's motion for summary judgment as to the sex discrimination claim. At the pre-trial hearing it was agreed that the issue as to that claim might be treated as being the subject of cross-motions for summary judgment.

The plaintiff also asserts a claim based upon alleged racial discrimination.

Briefly, it appears that, on or about February 11, 1969, the plaintiff applied for employment with defendant in its mail room. He was interviewed by Mr. Nash, who was defendant's Supervisor of that department. Mr. Nash did not recommend him for hiring because in Mr. Nash's opinion the plaintiff was effeminate. Defendant has admitted that the plaintiff was not employed due to the adverse recommendations of Mr. Nash.

Plaintiff, who has fulfilled complaint procedures before the Equal Employment Opportunity Commission, asserts sexual discrimination under Title VII of the Civil Rights Act.[1]

On December 4, 1973, this Court (Judge Sidney O. Smith presiding) stayed a ruling on plaintiff's motion for summary judgment, and re-stated that stay order on March 4, 1974, pending the then pending en banc reconsideration by the Fifth Circuit Court of Appeals in *Willingham v. Macon Telegraph Publishing Co.*, 482 F.2d 535 (5th Cir. 1973). The full Court reconsidered and decided that case. *Willingham v. Macon Telegraph Publishing Co.*, 507 F.2d 1084 (5th Cir. 1975). Thus the issues presented in the claim based upon sex discrimination are now ripe for decision.

### The Claim of Sex Discrimination

Plaintiff argues that it is forbidden under present law for an employer to consider a job applicant's affectional or sexual preference in hiring and that, therefore, the employer's election not to employ plaintiff because applicant (a male) appeared to be "effeminate" constituted an unlawful discrimination.[2]

The place to begin consideration of this sort of problem is at the beginning. At the beginning point, the presumption in this nation was that individual citizens are free to make such transactions as they chose to make,—advised or ill-advised; wise or foolish; morally right or morally wrong; indeed, prejudiced or unprejudiced.

The freedom envisaged seemed to be based upon several assumptions. One was that free people would, as a body, ultimately choose wisely and righteously. Another is that, in order for one to be free, he or she must be free to do wrong. For a people to be free to do only that which is right necessarily assumes that there will be some government or other secular institution to say, with authority, what is right. The King of England, (by virtue of divine appointment) had performed that function before the colonists, with some arrogance, announced that they could dispense with his services. During the

1. 42 U.S.C. § 2000e et seq. Plaintiff's complaint also alleged sex discrimination arising under Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. This allegation was dismissed in an order entered December 4, 1973.

2. Plaintiff points out that defendant employed a female black applicant for the position sought by plaintiff. He thus argues that the defendant accepted an employee presumably displaying effeminate characteristics resulting in plaintiff's having been discriminated against because he was a male.

The Court views the situation differently. It appears that the defendant concluded that the plaintiff, a male, displayed characteristics inappropriate to his sex, the counterpart being a female applicant displaying inappropriate masculine attributes.

foreshortened existence of the German Third Reich, the citizens of that nation were perfectly free to do right. Its Chancellor and his ministers were available to say, with some authority, what was right.

The people of this Country have opted out of such a narrow definition of freedom, impliedly rejecting the notion that Divinity really appointed the monarch or that efficiency and security sufficiently justify the dictator. In our main pursuits, we suffer our fellows to commit their blunders while they helplessly watch us do ours.

But anarchy does not reign here. After a near approach to it under the Articles of Confederation, we imposed government upon ourselves under the Constitution (with the simultaneously promised, and speedily enacted, Bill of Rights). We modified the beginning point almost immediately and have, through our elected representatives, done so from time to time ever since. When certain conduct is proscribed, by constitutional enactment of the Congress with the approval of the executive (or, constitutionally, in spite of his disapproval) our freedom is limited. Such an enactment is the law, and this Court enforces the law. Freedoms not thus proscribed have equal standing and dignity with law, and this Court must act so as to secure them. This is so, whether the person acting as judge of the Court approves of or denounces the law and whether or not he personally feels that the freedom is wisely retained or ought to be limited or proscribed.

With that background, let us see just where we are with respect to the freedom of an employer to decide which applicant for employment will be accepted to fill a vacancy and which will be rejected. Clearly we no longer reserve to the employer unfettered freedom to pick and choose as he wishes, wisely or foolishly, from good motive or bad. Through our constitutionally authorized processes of government many restraints upon the employee-employer relationship appear.[3]

Pertinent to the issue at hand, of course, is the Civil Rights Act of 1964. Subject to the evil inherent in glib summary, it can be said that law forbade an employer to consider, as a factor in determining whether or not to hire an applicant, the applicant's race, color, religion, sex, or national origin. Presumably, theretofore, employers had been free to pick and choose as they wished, with or without regard to race, color, religion, sex, or national origin.[4] Sufficient facts were made known to the Congress for its decision that it was in the national interest to prohibit such discrimination.

Much has been said about the various apparent approaches taken by courts and judges to this statute. "Liberal construction" and "strict construction" are terms loosely used. But they may be, upon examination, quite reconcilable. From these laws the courts know what is forbidden. No matter how ingeniously contrived, action which accomplishes the forbidden result will be declared illegal.[5] Some may say that this is "liberal construction."

Rights not forbidden are reserved to the individual. The courts know, from these laws, not only what is forbidden but, by absence of proscription, what is not forbidden. If the law making process has yet reserved freedom of action (by not forbidding it) to an employer, it

3. *See, e. g., Norris-La Guardia Act*, 29 U.S.C. § 101 *et seq.*; *Labor-Management Relations Act*, 29 U.S.C. § 141 *et seq.*; *Fair Labor Standards Act*, 29 U.S.C. § 201 *et seq.*; *Age Discrimination in Employment Act*, 29 U.S.C. § 621 *et seq.*

4. Subsequent judicial construction of 42 U.S.C. § 1981, part of the Civil Rights Act of 1866, made employment discrimination on the basis of race illegal. *See Sanders v. Dobbs Houses*, 431 F.2d 1097 (5th Cir. 1970).

5. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Pond v. Braniff Airways, Incorporated*, 500 F.2d 161 (5th Cir. 1974); *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir. 1971).

is the duty of the courts to protect it. Thus, beyond the outer edge of the law; that is, in areas where freedom has not been constitutionally restricted; the courts firmly secure the freedom. Some may here find "strict construction" or, perchance, "liberal construction" of a freedom.

However characterized by the commentator, the clear duty of the Court is to give full effect to the statute constitutionally enacted and to give full effect to the freedom of action we, as a people, have retained for ourselves.

It is abundantly clear that the Civil Rights Act of 1964 has for its purpose the guarantee of equal job opportunity for males and females. Much has been written upon the subject of so-called "sex *plus*" discrimination. In the final analysis, isn't this but a "shorthand" way of saying that the national purpose cannot be circumvented by lip service adherence to the Civil Rights Act while thwarting its purpose through the application of employment standards, to male and female alike, which, in application, deny employment to one sex or the other?

It might sound like legality to announce a program of hiring without regard to sex all persons whose facial hair does not, unshaven, grow to a visually perceptible length in two weeks, but who could deny that such an employer effectively discriminated against males? Indeed, the reverse of the case under consideration would not, the Court apprehends, be lawful. Were an employer to offer employment to all persons, men and women alike, who were effeminate, would such employer not discriminate against males? Would this not be so even though, admittedly, there would be some males who would qualify and presumably, be given employment on an equal basis with competing female applicants?

So the courts knock down sham and subterfuge to see to it that the mandate of the law be carried out. Yet the limit of the mandate is as important as its content. Beyond the limit of this law is freedom of action and freedom is to be protected with no less vigor than enforcement of a statute.

■ The Court has examined this issue. The intent of the Civil Rights Act insofar as it applies to sex discrimination in employment is "the guarantee of equal job opportunity for males and females." *Willingham, supra* at 1091. Whether or not the Congress should, by law, forbid discrimination based upon "affectional or sexual preference" of an applicant, it is clear that the Congress has not done so.[6] The Civil Rights Act is not just the "starting point" for this Court's extension of limitations upon employers; it is both the starting point and the ending point.

The defendant is granted summary judgment insofar as the case proceeds upon a claim of sex discrimination.

### The Class Action Aspects

■ In the March 4, 1974, order the Court dismissed the class action aspects of the case. Since that order the decision of *Alpha Portland Cement Company v. Reese*, 507 F.2d 607 (5th Cir. 1975) has been handed down. In that case the Court ruled that the *Sanchez* standards do not apply to the § 1981 aspects of a case wherein both Title VII and § 1981 are asserted as statutory predicates. Because *Reese* might appear to cast doubt on some of the reasoning utilized in the March 4th order, the Court thinks some clarification is needed.

This Court does not read the March 4th order as applying the *Sanchez* standards to the class action question under § 1981. Rather, the Court understands the March 4th order to apply both

---

6. Significantly, it appears that H.R. 5452 is presently pending before the Congress; it would, if enacted, forbid such discrimination; it has not been enacted as law by the Congress. It will not be enacted here in these Chambers.

*Sanchez* standards and the requirements of Rule 23 to the class action question under Title VII, but as to the class action under § 1981, only the Rule 23 requirements are applied. If that was not what was done in the March 4th order, this Court now so rules. Thus, given consideration to *Reese* this Court thinks a class action is inappropriate.

To summarize—the Court has granted defendant's motion for summary judgment on the sex discrimination claim. The case will proceed as to the plaintiff's individual claim on the alleged race discrimination.

It is so ordered.