Joyce **GRAYSON**, Plaintiff,

v.

The **WICKES CORPORATION**,
Defendant.

No. 75 C 2798.

United States District Court,
N. D. Illinois, E. D.

May 17, 1978.

1976 and not just at the time of service of process in 1976.

**6.** See Footnote 1.

John F. McCarthy, McCarthy & Levin and David J. Feeley, Chicago, Ill., for plaintiff.

Roger L. Taylor and Roger G. Wilson, Kirkland & Ellis, Chicago, Ill., for defendant.

## MEMORANDUM

PERRY, Senior District Judge.

This is a suit by a female employee alleging her former employer discriminated against her because of her sex. The plaintiff has charged and contended, *inter alia,* that she was paid a lower salary than her male predecessor and male successor in one position; that defendant was required to, but did not, return her to that position upon her return from maternity leave; and that later another position she held was abolished and her employment terminated because she was an unwed mother. The defendant employer has denied and contended against plaintiff's claim of unequal pay and has denied her sex discrimination charges and contended that it did not transfer, demote or discharge plaintiff, or discriminate against her in any way, because of her unwed and pregnant status.

Plaintiff Joyce Grayson (hereinafter "plaintiff" or "Grayson") charged in her complaint that defendant Wickes Corporation (hereinafter "defendant" or "Wickes") discriminated against her because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (hereinafter "Title VII"). Jurisdiction was further invoked pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.,* as amended by the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (hereinafter "Equal Pay Act") to recover lost wages due a female.

Just prior to trial plaintiff filed a jury demand. Defendant objected on the ground that the demand was not made in

apt time, having been made on the eve of trial, and objected further that plaintiff was not entitled to a jury trial as a matter of law under Title VII. After considering the memoranda of counsel and hearing argument of counsel for both parties, the court overruled defendant's objection to a jury trial based on a late filing of the jury demand. The court ruled that plaintiff was entitled to a jury trial on the issues raised under the Equal Pay Act but that plaintiff was not entitled to a jury trial on her claim under Title VII. The court's order also provided that all relevant evidence adduced before the jury would be considered as evidence upon the bench trial of the Title VII claim; and it provided further that after the case was submitted to the jury, the court would then hear all additional relevant evidence on plaintiff's VII claim.

The issues involved in Grayson's claim under the Equal Pay Act came on for trial before the jury. Grayson was first employed by Wickes as a Manager of Advertising in its Retail Division at an annual salary of $25,000 in May of 1973. In September of 1973 she was promoted to the position of Director of Advertising at an annual salary of $27,000. Grayson made a showing that her immediate predecessor as Director of Advertising was a male, Lou Masterson, and that he was paid at an annual rate of $28,000 and, in addition received certain fringe benefits which she did not receive; that her successor as Director was likewise a male, Joseph Raphael, that he was paid at an annual rate of $30,000 and later was receiving pay at a rate of $35,000. Grayson claimed the duties she performed as Director of Advertising were the same, or substantially the same, as those performed by her male predecessor and male successor; that despite her qualifications and good performance on the job, she received a lower salary. She contended the sole basis for such a salary differential was her sex. Wickes admitted it made such payments to Lou Masterson and Joseph Raphael but contended that the sex of plaintiff was in no way related to the pay differentials.

Wickes introduced evidence before the jury to show that the difference between Grayson's salary as Advertising Director and the salaries of her male predecessor and male successor were based on factors other than sex. Grayson had a limited educational background and no formal education beyond high school. Wickes showed that Grayson had been employed only a few months at Wickes when she was promoted to an administrative position as Director of Advertising although she had no experience as an executive before that time and lacked chain store experience. Wickes offered proof that Grayson's predecessor had prior chain store experience and executive experience before he became Director of Advertising; that he had been employed for some time in the Wickes' organization; and that after his experience in Wickes advertising department, he became Manager of a Wickes' store. Grayson's predecessor was a college graduate with a Master's degree from the University of Chicago and had majored in the fields of advertising and business management.

Grayson's successor, Joseph Raphael, also had a chain store and advertising background. He was residing with his family in South Carolina, where he had been employed by Wickes. Wickes offered evidence to show that Raphael had been employed by Wickes for a number of years; that he had risen to an executive position at $36,000 per year; that due to internal difficulties the position he held had been abolished; and that Wickes had planned to transfer Raphael to temporary duties until a new store was opened near his home, of which store he was to become the sales manager. Wickes employed Raphael at a $30,000 annual salary rate to take over the position of Director of Advertising on a caretaker basis until it found a qualified person to fill the position and until the new store was opened in North Carolina. The evidence showed Raphael took the position on a temporary basis, expecting it would be filled very quickly; but there was a delay; and it appeared Raphael would be needed in the position for an indefinite period. Raphael did not want to move his family to Chicago from South Carolina. Wickes then agreed to pay Ra-

phael at a rate of $35,000, allowing him the additional $5,000 to maintain himself in Chicago and to make regular trips home to be with his family. According to the evidence, the additional $5,000 was not considered by Wickes as additional salary but only special compensation under the circumstances. The arrangement continued only a short time until the North Carolina store was opened and Raphael was transferred there at a higher salary.

█ Sufficient evidence was adduced by defendant before the jury to show that Grayson's job as Director of Advertising did not require the skill, effort and responsibility required of her male predecessor and male successor. Wickes showed bona fide business reasons for its payments to Lou Masterson and Joseph Raphael and for the difference in salary paid Grayson. The jury heard all of the evidence of the parties concerning Grayson's claim under the Equal Pay Act. The jury had before it sufficient evidence to create an issue of fact as to whether Grayson was paid less than her male predecessor and male successor because she was a female; and there was sufficient evidence before the jury to support its finding of the issues for the defendant employer. The court permitted no evidence to be adduced, nor statement to be made, before the jury concerning the fact that Grayson had become an unwed mother, or that she had been granted maternity leave, so as to prevent any possible prejudice to Grayson.

After hearing the evidence, arguments of counsel for the parties and the court's instructions, the jury returned a verdict for the defendant Wickes and the court entered judgment upon the jury's verdict. There was no evidence offered before the jury that tended to show any discrimination by Wickes against Grayson because of her sex, and in fact there was no proof of discrimination against her by Wickes whatsoever before the jury. Had the court not granted a jury trial on the equal pay issue and if it had heard the evidence without a jury, the court would have found against Grayson and in favor of Wickes and entered judgment accordingly.

Following the jury trial, the issues under Title VII were tried before the court. The evidence was clear that Wickes management had been impressed with Grayson's qualifications and solicited her employment originally as Wickes' Advertising Manager in March and April of 1973. Grayson had worked for an advertising agency; and for about a year prior to her employment at Wickes, she had been employed by Colby's Home Furnishings as manager or director of its advertising program. At Colby's Grayson's annual salary was approximately $18,000, the highest salary she had ever earned up to that time. She left her position at Colby's to accept the position of Advertising Manager for Wickes Furniture Division after Wickes met her salary demand of $25,000 a year. A few months after she joined the Wickes organization, her immediate superior left his employment at Wickes. Eugene Gordon (hereinafter "Gordon") was at the time the General Manager of Wickes Furniture Division in Chicago and he was familiar with Grayson's work and talent. He recommended her for promotion to the position of Director of Advertising with an increase in annual salary to $27,000. Wickes so employed Grayson in that position and at that salary on or about September 1, 1973. Neither Gordon nor Wickes management had any knowledge of the fact that Grayson was pregnant and would need to take maternity leave when she was promoted. Grayson knew before her promotion that she was pregnant but concealed her pregnancy from Wickes' management.

By late October, or early November, it was apparent from Grayson's physical appearance that she was pregnant although she was a single woman who had never been married. Gordon became aware of the fact and called her into his office in early November for a conference. Gordon told Grayson that he thought the Director of Advertising would be required to do more traveling and that this might be a hardship on her as a mother of a new-born infant. He testified that Grayson admitted to him

that she would have to reconsider filling the position if extensive travel was involved. He said he understood Grayson wanted to return to Wickes after her maternity leave but that she did not insist on returning to her position as Director of Advertising. He left the meeting feeling that Grayson was substantially in agreement with him that another job might be more suitable. Gordon said he wanted to assign her to other duties but wanted to allow her to retain her salary of $27,000 annually.

In her position as Director of Advertising, Grayson was required to have a significant amount of daily personal contact with Wickes' management personnel, her subordinates and others. The evidence showed that by November of 1973 her relationships with her peers and subordinates had deteriorated to such an extent it impaired her usefulness to Wickes as Director of Advertising, although she maintained a good relationship with her superiors. Gordon testified that by November her relationships with some people in the advertising department were not entirely satisfactory and that he found she was not trained in managing her subordinates. The testimony also revealed that Grayson's handling of advertising had generated substantial opposition and resentment among Wickes' store managers and they were critical of Grayson's handling of advertising. Gordon said Grayson did not have good rapport with the store managers; that they had complained she was obstinate and inflexible and would not consider their suggestions about better tailoring advertising to their local needs.

Gordon's testimony was to the effect that he considered Grayson talented and knowledgeable in the field of advertising and that he wanted to retain her services; but that he felt, because of her deficiencies in the position of Director of Advertising, she would be better suited in a position with Wickes where her talents could be utilized, and without encountering problems arising from her personal contacts with people. About a week after Gordon's conference with Grayson, he discussed her performance as Director of Advertising with John Drum, the president of Wickes Corporation, and

recommended that Grayson would be better suited in another position with Wickes. The evidence showed that the advertising department could not be run on a part-time basis by an employee on leave of absence. Gordon and Drum agreed to ask Joseph Raphael to fill the position of Director on a temporary basis while Wickes sought a permanent replacement.

Gordon had another conference with Grayson in late November. He testified he told her then that it would be best if she came back after maternity leave in the position of Manager of Electronics at her same $27,000 salary rate. He said he told her then that Joseph Raphael would be temporarily assuming the Director of Advertising position while Wickes sought a replacement as Director of Advertising. Gordon testified that he thought Grayson substantially agreed to accept another assignment upon her return.

Grayson also testified about this conference. She said she understood Gordon had told her she would be reassigned at the same annual salary; but she denied she agreed to the transfer and said she merely remained silent. However, one of defendant's exhibits showed that on December 14, 1973, Grayson wrote a memorandum to Gordon and others saying she was looking forward to returning and managing the electronics aspects of Wickes' advertising. It was Grayson's contention that any agreement to transfer to an alternate position was made at a time when she was pregnant and about to have her baby and when she was uncertain about her future; and that any statements or letters indicating an agreement to transfer were made under the economic duress of those circumstances.

As previously agreed, Grayson began her maternity leave on December 15, 1973. She gave birth to a baby boy on January 15, 1974. Grayson returned to Wickes after maternity leave on March 4, 1974 in the position Gordon had promised her and at the same $27,000 salary she received as Director of Advertising. The testimony revealed that upon her return she made no

complaint about her new assignment as Electronics Manager or Manager of Market and Sales Research, and that she attended to her duties in a manner satisfactory to General Manager Gordon.

Grayson contended that Wickes was required to return her to her position as Director of Advertising after her return from maternity leave. She claimed it was company policy for women to take maternity leave and then be permitted to return to their prior status as employees upon termination of maternity leave. Wickes was required to give her maternity leave as it did other female employees. However, Grayson's situation was different in two respects. She had been in an executive and managerial position and hers was a pregnancy out of wedlock. She failed to show that she was treated any differently than male employees had been or would have been treated. Although she claimed Wickes had a policy of returning males to their same positions and at the same salaries after sick leaves, she failed to present evidence in support of her assertion. She did not adduce evidence to show that unmarried male employees who engaged in sexual relations and produced illegitimate offspring would have been treated differently by Wickes than she was.

Grayson contended that she was not only denied the return to her former position as Director of Advertising but that she was thereafter harassed and was discriminated against by her transfer to another position. By the testimony of certain witnesses, Grayson sought to prove that there was a plot to "get" her because she did not fit the "high ideals" of the Wickes organization. Many of these statements were random statements and in some instances the testimony was not credible. Grayson did not prove by a preponderance of the evidence that Wickes and its senior officers did not want Grayson to return after her maternity leave because she was an unwed mother. Nor did Grayson prove that they eventually terminated her position and employment because she was an unwed mother.

In late June of 1974 Wickes offered Grayson another position as Manager of Sales Promotion for the Furniture Division at an annual salary of $19,000. The evidence showed the duties and responsibilities in this new position were not outside her chosen career field and usual type of employment. Grayson advised Wickes that she would not accept the offer and her employment was terminated. Grayson does not seek reinstatement with Wickes.

Wickes contended there were legitimate, non-discriminatory reasons for its actions and it proved there were legitimate business justifications for its actions. Grayson's difficulties came in a climate of continuing upheaval in Wickes' management and in Wickes' advertising department. The evidence showed that during a five-year period Wickes had changed General Managers five times. In the advertising department alone during that period there had been seven changes of Directors of Advertising, including Grayson. There had been innumerable changes made in positions and in salaries for employees in the advertising department. In early June of 1974, Wickes subordinated Gordon to Paul Tatz (hereinafter "Tatz") and Tatz became Wickes' General Manager. Wickes' financial reports showed the Furniture Division was losing money and in a difficult financial condition; and Tatz was appointed to put the Furniture Division on a sound financial basis. Tatz found the Division was overstaffed. To reduce costs and improve profitability, the evidence showed the labor force of Wickes' Furniture Division was reduced from 936 to 636 males and from 735 to 490 females in the period June 1974 to October 1975 during Tatz' tenure as General Manager. Tatz eliminated many positions occupied by both males and females; transferred some employees to other positions; and reduced the salaries of many employees retained. Among other things, Tatz reorganized the advertising department and reduced that department's staff from 14 to 6 people.

Wickes had an outside advertising agency and in late June of 1974 Tatz informed Grayson that the functions she performed as Manager of Market and Sales Research

were being taken over by the outside agency. An exhibit in this case shows Tatz wrote Grayson and told her this. He said management had explored position openings in the Furniture Division and found the position of Manager-Sales Promotion was open in the advertising department. He offered Grayson the position at an annual salary of $19,000, which was $1,000 more than she earned at Colby's before joining the Wickes' organization a little more than a year before. She declined the offer, decided to resign, and her employment was terminated. Although she asserted the acceptance of the alternate position would seriously impede her career, she adduced no evidence of possible future damages.

In June 1974 Grayson filed a complaint of sex discrimination with the Illinois Fair Employment Practice Commission. In the following September she filed similar charges with the Equal Employment Opportunity Commission and in June of 1975 she received from the EEOC a "Notice of Right to Sue". When Grayson did file her suit under the Equal Pay Act she combined it with her complaint under Title VII. Grayson also contended that defendant had her position abolished and the work transferred to an outside agency in retaliation because she filed a claim with the Equal Employment Opportunity Commission and sought to sue Wickes. Wickes offered overwhelming evidence to establish that such was not the fact and that the position she held would have been abolished and the work she performed would have been transferred to an advertising agency even if it had been held by a male instead of a female.

Wickes contended vigorously throughout trial of this case that its decisions to transfer Grayson to another job and to offer her another position were in no way related to her unmarried, pregnant status and that any talk by its employees about Grayson's sexual behavior and life style related in no way to defendant's employment decisions. Personnel from Wickes' management so testified. The evidence did reveal that after Grayson's pregnant condition became obvious, a feeling developed against her among employees; and Grayson adduced evidence to show that random statements about her behavior were made. Wickes could not control the subjective feelings of Grayson's peers and subordinates; nor could it control their right to free speech in criticizing her. As said in *Purvine v. Boyd Coffee Co.,* 13 FEP 1015, 1017 (Dist.Ct.Ore.1976), "[T]itle VII does not make an employer responsible for every inconsiderate remark made by office personnel".

Gordon testified that in late 1973 before Grayson went on maternity leave, he learned antagonisms had developed in the advertising department against Grayson and that she lacked support there. He made further inquiries and testified that if she had been a male he would have discharged her. The evidence revealed that Wickes had decided, regardless of Grayson's background, that she was no longer qualified for heavy management responsibilities. It also appeared from the evidence that Grayson's unconventional life style of giving birth to a child as an unwed mother had impaired her ability to command the respect of her peers and subordinates so that Wickes in good faith felt it was advisable to transfer her to another position. This court does not sit as an arbiter to determine whether one executive or another should have a promotion or demotion. The function properly belongs to management. However, it does appear to this court from the evidence that Wickes was not obligated to keep Grayson in her position as Director of Advertising when she for various reasons had destroyed her credibility as a potential management person and when her conduct so offended her peers and subordinates as to make her ineffective as an executive. The Civil Rights Act of 1964 does not demand that an employee be kept in a position for which she is not qualified. Wickes showed a business necessity sufficiently compelling to override Grayson's discrimination charge.

Wickes did have a policy of granting maternity leave to its married women employ-

ees and then permitting them to return to their employment after childbirth at their same status. That was Wickes' policy for employees but not for an executive such as Grayson had become. Nevertheless, upon her return from leave, Grayson was given a high level position without a change in salary and accorded preferential treatment. Among other things she was permitted to report late for work and to work part-time at home so she could care for her baby. This special consideration and preferential treatment caused dissension among some employees as none were granted this privilege. Grayson's supervisor reported to Wickes' Vice-President of Personnel that there were ill feelings in the advertising department because of her working part-time at home but the Vice-President of Personnel defended Wickes' preferential treatment of her. It was shown that Grayson's supervisor moved her out of the advertising department because she was a "disruptive influence" due to the preferential treatment accorded her. The evidence also showed the Director of Advertising, Raphael, believed the nature of her research work required thought and concentration in a location quieter than in the advertising department.

 Wickes was not required to return Grayson to the position she occupied before she left on maternity leave, provided such refusal is not grounded on her sex. Grayson did not prove by a preponderance of the evidence that Wickes discriminated against her because of her sex in violation of Title VII. She failed to show she was treated any differently than similarly situated male employees had been or would have been treated. She failed to prove that unmarried male employees who engaged in sexual relations and produced illegitimate offspring would have been treated differently by Wickes. Nor, despite her assertions, did Grayson present evidence to show that male employees at Wickes who took leaves of absence returned to the same positions they occupied and at the same salaries which they received prior to their leaves. Wickes showed by a preponderance of the evidence justification for its actions involving Grayson and that it did not transfer, demote or discharge her because of her unwed and pregnant status.

The court concludes that even if Grayson had proven by a preponderance of the evidence that she was transferred, demoted or discharged because of her unwed status, Wickes did not thereby commit an unfair employment practice, namely sex discrimination in violation of Title VII. Wickes did not purport to adjudge Grayson's sexual behavior as aberrant, irresponsible or undesirable. Nor does this court. But the court, under the circumstances of this case, feels compelled to point out that federal courts have held that transfer, demotion or discharge of an employee for various forms of aberrant sexual or sex-related behavior does not constitute unlawful sex discrimination under Title VII. *Wardlaw v. Austin School District,* 10 FEP 892 (Dist.Ct.W.D. Tex.1975); *Omaha Public Schools v. Brown,* 13 FEP 767 (Neb.Dist.Ct.1976); *Hollenbaugh v. Carnegie Free Library,* 436 F.Supp. 1328 (W.D.Pa.1977); *Smith v. Liberty Mutual Insurance Company,* 395 F.Supp. 1098 (N.D.Ga.1975); *Powell v. Read's Inc.,* 436 F.Supp. 369 (D.Md.1977); *Farr v. Chesney,* 437 F.Supp. 521 (M.D.Pa. 1977).

For all of the foregoing reasons, plaintiff Joyce Grayson should take nothing, this action should be dismissed on its merits, and judgment should be entered in favor of the defendant Wickes Corporation. The court in its discretion is refraining from allowing attorneys' fees to defendant Wickes as it believes plaintiff Grayson presented her claim in good faith.

During the course of the trial and reopening of proofs for the taking of limited evidence, evidence was adduced as to Grayson's alleged damages and the court heard argument of both parties thereon. In the event of an appeal of this case, there exists the possibility that the United States Court of Appeals, or the Supreme Court of the United States, might see fit in its wisdom to reverse the decision of this court and find Wickes liable and Grayson entitled to an

award of back pay. This court, therefore, is entering simultaneously herewith, but separately, Conditional Findings of Fact and Conclusions of Law on the issue of the amount of damages for the purpose of avoiding another long trial, the incurring of additional costs to the parties, and in the interest of conserving judicial time.

This Memorandum shall stand as the court's findings of fact and conclusions of law herein.