**DeMuth v. Miller**

*Samuel L. Andes,* for plaintiff.
*Markian R. Slobodian* and *Beatrice Dohrn,* for defendant.

HESS, *J.,* December 20, 1993—In October of 1990, the plaintiff, Donald L. DeMuth, fired the defendant, Daniel C. Miller, when he learned that Miller had appeared on a local television station as a spokesman

for a gay rights group. Miller, a certified public accountant, had worked for DeMuth since December of 1985 as a professional management consultant in DeMuth's firm, a business which nearly exclusively serves health care professionals. Following a probationary period, Miller became a contract employee. Over the years, his salary was raised substantially. At least three different one year employment contracts were entered into between the parties, covering the period May 1986 through May 1989. At the trial of the case, the plaintiff produced an unsigned copy of a contract which purported to run from June 1, 1989, to May 31, 1990, and testified that although he could not locate his signed copy of the agreement, he believed that one had been executed. The plaintiff conceded, however, that no contract was in effect in October 1990 when Miller was dismissed.

Pursuant to the terms of the earlier written contracts, Miller could be terminated "for cause." The contract went on to define "cause" as including, among other things, homosexuality. The document further required that, in the event of such termination, Miller would be required to pay DeMuth a sum equal to 125 percent of the fees received by DeMuth from clients taken by Miller, following termination, based on the total fees received from those same clients during the 12 months prior to the termination.

In November of 1991, the plaintiff filed his complaint seeking money damages with respect to those clients of his who had left him in favor of Mr. Miller. The defendant filed a counterclaim in defamation based on a letter which Mr. DeMuth had written prospective clients of Miller suggesting that contact with Miller might involve an increased risk of contracting HIV infection.

At the trial of the case, we permitted to go to the jury the question of whether or not the previous written

terms of the parties' contract remained in full force and effect by virtue of their intervening conduct. We also denied motions to dismiss based on an assertion that the homosexuality provisions of the contract were unenforceable as against public policy. In its verdict, the jury specifically found that Mr. Miller had not misappropriated confidential or secret information belonging to DeMuth insofar as his client base was concerned. On the other hand, they expressly concluded that the parties were bound by their earlier contract containing a provision making homosexuality a basis for terminating Miller's employment. They then went on to award damages in the amount of $123,648.43; this notwithstanding the stipulation of the parties that 125 percent of all billings which could arguably fall within the disputed contract clause would not exceed $110,000.00.

The basis for relief asserted by the defendant in his post-trial motions, are several. We will deal with these matters in the order in which they were briefed by the parties.

The defendant first suggests that the judgment must be entered, notwithstanding the verdict, for the reason that the contract whereby the plaintiff was permitted to fire the defendant for being gay violated either public policy or state and federal constitutions. The defendant cites to executive orders of this Commonwealth and to other holdings of our courts which prohibit actions of the government—the exercise of state action—in indulging in discrimination of the type at bar. The defendant then argues that merely because enforcement of the contract has been sought in a court of law, the discrimination is one being perpetrated by the government rather than by a private individual. Indeed, in *Shelly v. Kraemer,* 334 U.S. 1 (1948), the Supreme Court of the United States held that the judicial en-

forcement, by state courts, of covenants restricting the use or occupancy of real property of persons of the white race violated the equal protection clause of the Fourteenth Amendment. The court, while conceding that the Fourteenth Amendment did not reach private conduct but was directed against state action only, held, nonetheless, that judicial action in the enforcement of private agreements is state action and that enforcement of restrictive covenants against certain races was violative of the Fourteenth Amendment. *Shelly,* in essence, vindicated the views of Mr. Justice Harlin who in dissenting in *Plessy v. Ferguson,* 163 U.S. 537, 559 (1896) penned the immortal words: "Our constitution is color blind." At the heart of this case is the question of whether or not the constitution is equally blind to sexual orientation.

In this regard, we are without appellate guidance in Pennsylvania. Certain federal courts have spoken to the issue, some more recently than others. In 1975, in *Bennie E. Smith v. Liberty Mutual Insurance Co.,* 395 F. Supp. 1098 (1975), the United States District Court dealt with the question of whether or not the Civil Rights Act of 1964 forbade employment discrimination based on "affectional or sexual preference." Without addressing the issue from a constitutional standpoint, the court assumed that the matter of forbidding discrimination based upon "affectional or sexual preference" was a matter for the legislature. The court left no doubt concerning its feelings in a footnote:

"Significantly, it appears that H.R. 5452 is presently pending before the Congress; it would, if enacted, forbid such discrimination; it has not been enacted as law by the Congress. It will not be enacted here in these chambers." *Smith,* 395 F. Supp. at 1101, note 6.

More recently, the federal courts have dealt head-on with the constitutional issues having to do with sexual

orientation and employment. These make clear that, while Fifth Amendment equal protection claims are brought with respect to acts of the federal government and Fourteenth Amendment equal protection claims relate to actions of the states, the standards for both are essentially the same.

In *Doe v. Gates,* 981 F.2d 1316 (1993), the United States Court of Appeals for the District of Columbia circuit assumed that a blanket policy on the part of the CIA, against the employment of homosexuals, would violate equal protection rights under the Fifth Amendment but did so only for the purpose of argument. The court based its decision on the fact that the plaintiff was unable to point to evidence contradicting the government's position that the CIA discharged him after an individualized assessment of the circumstances of his case, rather than pursuant to a blanket ban. In other words, the record of the case did not support a contention that Doe was dismissed merely because of the fact that he was homosexual.

In *Dahl v. Secretary of the United States Navy,* 830 F. Supp. 1319 (1993), the United States District Court for the Eastern District of California dealt with the policy of the United States Navy excluding homosexuals. The case involves a lengthy discussion of the test to be applied in analyzing equal protection claims. The court determined that the so-called "strict scrutiny" test was inapplicable and went on to apply what they called an "active rational basis review." Citing recent pronouncements of the Supreme Court, the District Court suggested that the burden is no longer on a policy maker to persuade a court that a policy possesses a rational basis. The burden, rather, is on a person challenging a policy to negate a rational basis for legislative justification. They also agreed that judicial review of

166

military regulations is more deferential than a constitutional review of similar laws or regulations designed for civilian society. All of this notwithstanding, the court, after reviewing various reports which had been made part of the record in the case, went on to conclude that virtually all of the reasons asserted by the Navy as a basis for their policy were prejudicial on their face; in other words, the bases for the policies were not grounded in facts. However, we note that the court based its conclusion on a substantial factual record including testimony of none other than General Norman Schwarzkopf.

We could continue our analysis of various cases dealing with similar equal protection claims. See *e.g., Steffan v. Aspin,* 8 F.3d 57 (D.C. Cir. 1993); *Jantz v. Muci,* 976 F.2d 623 (1992). We are satisfied, however, that this would be to no end. These cases each deal carefully with the state of a factual record adduced in the context of a federal claim. In this case, there was no factual record made with respect to the due process or public policy claim, apart from the contractual aspect of the lawsuit.

The defendant, of course, suggests that the discrimination, inherent in Mr. DeMuth's actions, is so obvious that the fact that it is violative of due process requires no proof. It would, however, be the height of impercipience for us to fail to take note of the national dialogue currently being conducted with respect to employment discrimination and gays. There is broad disagreement on the question of whether or not one's freedom of association encompasses a right of hiring and firing based on sexual orientation or whether a disdain for a lifestyle equates to bigotry. Despite the protestations of the defendant to the contrary, we fail to discern any current legislative or societal consensus on these matters. In the meantime, we are not justified in defining

public policy based on what we think it ought to be. In these regards, we take our cue from Judge Learned Hand who wrote:

"Nor is it desirable for a lower court to embrace the ... opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." *Spector Motor Service v. Walsh,* 139 F.2d 809, 823 (1944).

As another basis for post-trial relief the defendant contends that we erred in permitting the jury to infer that the relevant terms of an employment contract remained in effect between the parties even though the written contract had, itself, expired. We did, indeed, leave this question in the hands of the jury. We continue to believe that, in doing so, we acted properly. The factual inconsistencies in the case were, obviously, for the jury to resolve. In applying the facts, we instructed them that in accordance with *Smith v. Shallcross,* 165 Pa. Super. 472, 475, 69 A.2d 156, 158 (1949) as cited in *Burge v. Western Pennsylvania Higher Education Council, Inc.,* 391 Pa. Super. 108, 112, 570 A.2d 536, 538 (1990), to the effect that:

"[W]here a contract of employment for a definite time is made and the employee's services are continued after the expiration of the time, without objection, the inference is that the parties have assented to another contract for a term of the same length with the same salary and conditions of service."

We are satisfied that this continues to be the law in the Commonwealth.

Third, the defendant contends that the "contingent note payable" clause of the employment agreement is either an unlawful penalty or an unreasonable restriction on Miller's right to practice his chosen profession. This argument has surfaced, for the first time, during post-trial

motions. In other words, it was not raised in any of the pre-trial motions or at the trial itself. Specifically, there was no objection when we instructed the jury concerning the measure of damages in this regard. We are satisfied, therefore, that the issue has not been properly preserved for the purpose of post-trial argument.

Finally, the defendant cites as error a jury verdict in excess of $124,000.00 when the parties stipulated that damages due under the contract would not exceed $110,000.00. The plaintiff, in his brief, acknowledges that he is bound by the stipulation and we will mold the verdict accordingly.

We agree with the plaintiff that, in doing so, we must award prejudgment interest.

### ORDER

And now, December 20, 1993, the post-trial motions of the parties are granted, in part, and the verdict herein is molded in favor of the plaintiff and against the defendant in the amount of $110,000.00, together with interest from and after November 30, 1990. The remaining post-trial motions are denied.