[S.F. No. 23625. May 31, 1979.]

GAY LAW STUDENTS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
PACIFIC TELEPHONE AND TELEGRAPH COMPANY et al.,
Defendants and Respondents.

460

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■

## COUNSEL

David C. Moon, Robert E. Mann, Richard Gayer and John Eshleman Wahl for Plaintiffs and Appellants.

Thomas F. Coleman, Steven T. Kelber, Donald C. Knutson, Paul Freud Watman, Barbara E. Weiner, Patti Roberts, Anthony G. Amsterdam, Erica Black Grubb, Armando M. Menocal III and Lois Salisbury as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Warren J. Abbott, Assistant Attorney General, Carole R. Kornblum and Richard N. Light, Deputy Attorneys General, Alan C. Nelson, James S. Hamasaki, Calvin A. Mendonca, Harold R. Crookes, Robert V.R. Dalenberg and Gerald H. Genard for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—In June 1975 plaintiffs, four individuals and two associations organized to promote equal rights for homosexual persons, filed the present class action against Pacific Telephone and Telegraph Company (PT&T)[1] and the California Fair Employment Practice Com-

---

[1]The complaint names as defendants Pacific Telephone and Telegraph Company, a corporation; Gordon Hough, corporate president; H. A. Gerrish, vice-president; Robert Ward, manpower planning director; Laurence Entrekin, EEOC compliance director; Sally Silverman, an employment interviewer; and Does 1-100. The parties do not discuss the liability of these individual defendants apart from the liability of the corporation. We shall therefore use the abbreviation PT&T to refer generally to the corporation, its officers, and agents.

■■■■■■■■

mission (FEPC).[2] The complaint alleged that PT&T practices discrimination against homosexuals in the hiring, firing and promotion of employees, asserted the illegality of such employment discrimination and sought declaratory and injunctive relief to prevent PT&T from the continuation of such practices. The complaint also prayed for monetary damages to compensate for losses sustained as a result of PT&T's alleged past discrimination. As to the FEPC, the complaint asserted that, contrary to its alleged statutory mandate, the commission had improperly refused to take any action to remedy employment discrimination against homosexuals by PT&T and other employers.

PT&T demurred to the complaint, maintaining that even if it had adopted the alleged policy of employment discrimination against homosexuals, California law did not bar such discrimination. The FEPC filed an answer to the complaint, taking no position as to the propriety of the action as to PT&T, but asserting that the California Fair Employment Practice Act (FEPA) does not authorize FEPC action as to employment discrimination based upon "sexual orientation," i.e., homosexuality. The trial court sustained PT&T's demurrer without leave to amend, denied plaintiffs' prayer for mandate against the FEPC, and accordingly entered judgment for all defendants. For the reasons discussed below, we have concluded that the judgment in favor of PT&T should be reversed but that the judgment in favor of the FEPC should be affirmed.

1. *Summary of proceedings*

The issues before us on this appeal turn on the sufficiency of plaintiffs' pleading. Plaintiffs' complaint presents independent claims on behalf of one separate subclass against PT&T and a second subclass against the FEPC. We summarize first the allegations against PT&T.

The causes of action against PT&T are brought on behalf of a subclass composed of homosexuals who are past, present, or future applicants for employment or employees of PT&T, and have been or will be adversely affected by PT&T's alleged discrimination against homosexuals. This subclass is represented by two individual plaintiffs—Robert Desantis, who alleges that his application for employment with PT&T was rejected because of his homosexuality, and Bernard Boyle, who claims that

---

[2]The complaint names as defendants the Fair Employment Practice Commission of California; Pier Gherini, chairman of the commission; Charles Wilson, commission chief; and Roger Taylor, the former chief. We shall use the abbreviation FEPC to refer to the commission and its officials.

anti-homosexual harassment led him to resign from his job with PT&T. The subclass is also represented by plaintiff Gay Law Students Association, which alleges that its members will become attorneys and will be interested in working for PT&T, and by plaintiff Society for Individual Rights, a homosexual organization which alleges that its members have applied and will apply for employment with PT&T.[3]

The complaint alleges that "PT&T has maintained and enforced a policy of employment discrimination against homosexuals," and that "PT&T has, since at least 1971, had an articulated policy of excluding homosexuals from employment opportunities with its organization." Plaintiffs adduced detailed allegations to support this charge, including the allegation that "Plaintiff Desantis was refused permission to even apply for employment with Defendant PT&T when Defendant Silverman [the PT&T job interviewer] learned of his homosexual orientation." Exhibits attached to the complaint additionally support plaintiffs' further charge that PT&T follows a policy of discrimination against "manifest" homosexuals.[4]

Plaintiffs explain the economic impact of PT&T's alleged discriminatory policy: "PT&T employs over 93,000 people. . . . Many of PT&T's jobs require skills useful only in telephone companies, and not in the electrical or electronics fields generally. Thus persons having acquired such skills from PT&T or other telephone companies will be effectively denied employment in California if they are known or thought to be homosexual, as will PT&T employees who cannot obtain advancement within PT&T because of their homosexuality or who are fired in whole or in part for this reason."

In addition to declaratory relief, plaintiffs seek a permanent injunction barring PT&T from continuing to refuse to employ or promote persons because of their sexual orientation. Plaintiffs further ask the court to

---

[3]The organization plaintiffs have standing to represent their members in this action. (See *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415 [9 L.Ed.2d 405, 83 S.Ct. 328]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 122-126 [109 Cal.Rptr. 724].)

[4]PT&T in its briefs denies that it pursues a policy of discriminating against homosexuals. In assessing the sufficiency of a complaint against a general demurrer, however, we must treat the demurrer as admitting all material facts properly pleaded. (E.g., *Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357].)

order PT&T to pay monetary damages to compensate the victims of such discrimination for loss of wages or salaries.

Plaintiffs filed their cause of action against the FEPC on behalf of a second subclass of homosexuals who have complained or will complain to the FEPC of employment discrimination, but have been or will be refused assistance by the FEPC. All individual and organizational plaintiffs allege that they have been refused assistance by the FEPC because of that agency's policy of not accepting jurisdiction over complaints of discrimination based on sexual orientation. Plaintiffs therefore seek declaratory relief and mandate to compel the FEPC to accept jurisdiction over complaints of employment discrimination based upon homosexuality.

PT&T demurred to plaintiffs' complaint on the ground that it failed to state a cause of action. Answering plaintiffs' complaint, the FEPC admitted the pertinent allegations but denied that it has jurisdiction to accept complaints of discrimination based on sexual orientation. After hearing argument the trial court sustained PT&T's demurrer without leave to amend; the court also denied plaintiffs' request for mandate and declaratory relief against the FEPC. The court thereupon entered judgment for defendants on all causes of action. Plaintiffs appeal from that judgment.

2. *Plaintiffs' allegations of arbitrary employment discrimination against homosexuals state a cause of action against PT&T.*

We begin with a consideration of plaintiffs' claims against PT&T. PT&T asserts, in essence, that its employment practices are subject to no greater legal restrictions than the employment practices of any other employer in this state. Accordingly, PT&T argues that the provisions of the FEPA, which we discuss below, constitute the sole limitations on the company's authority to engage in discriminatory employment practices. As we shall explain, however, we have concluded that, contrary to PT&T's assertions, the equal protection clause of the California Constitution (art. I, § 7, subd. (a)) places special obligations on a state-protected public utility, such as PT&T, to refrain from all forms of arbitrary employment discrimination. In addition, we have concluded that PT&T's alleged employment discrimination also violates the explicit statutory prohibition on public utility discrimination embodied in section 453,

subdivision (a) of the Public Utilities Code. We turn initially to the constitutional question.

■ (a). *Article I, section 7 subdivision (a) of the California Constitution bars a public utility from engaging in arbitrary employment discrimination.*

Plaintiffs contend that PT&T's alleged discriminatory employment practices violate the equal protection guarantee of the California Constitution by arbitrarily denying qualified homosexuals employment opportunities afforded other individuals. ■ In analyzing this constitutional contention, we begin from the premise that both the state and federal equal protection clauses clearly prohibit *the state or any governmental entity* from arbitrarily discriminating against any class of individuals in employment decisions. (See, e.g., *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *Kotch* v. *Pilot Comm'rs* (1947) 330 U.S. 552, 556 [91 L.Ed. 1093, 1096-1097, 67 S.Ct. 910].) Moreover, past decisions of this court establish that this general constitutional principle applies to homosexuals as well as to all other members of our polity; under California law, the state may not exclude homosexuals as a class from employment opportunities without a showing that an individual's homosexuality renders him unfit for the job from which he has been excluded. (See, e.g., *Morrison* v. *Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375].) Courts in other jurisdictions have reached similar conclusions. (See, e.g., *Norton* v. *Macy* (D.C. Cir. 1969) 417 F.2d 1161; *Society for Individual Rights, Inc.* v. *Hampton* (N.D. Cal. 1973) 63 F.R.D. 399; *Saal* v. *Middendorf* (N.D. Cal. 1977) 427 F.Supp. 192, 199-203; *Martinez* v. *Brown* (N.D. Cal. 1978) 449 F.Supp. 207, 211-213; *In re Kimball* (1973) 33 N.Y.2d 586 [347 N.Y.S.2d 453, 301 N.E.2d 436]; cf. *Major* v. *Hampton* (E.D. La. 1976) 413 F.Supp. 66; *Bruns* v. *Pomerleau* (D.Md. 1970) 319 F.Supp. 58; *Mindel* v. *United States Civil Service Commission* (N.D. Cal. 1970) 312 F.Supp. 485; *Erb* v. *Iowa State Board of Public Instruction* (Iowa 1974) 216 N.W.2d 339. See generally Schlei & Grossman, Employment Discrimination Law (1976) pp. 365-368.)[5]

---

[5] In his dissent, Justice Richardson suggests that because article I, section 8 of the California Constitution does not specifically bar employment discrimination on the basis of sexual preference, the equal protection provisions of article I, section 7 are completely inapplicable in this case. (See p. 495, *post.*) With all respect, this reasoning does not withstand analysis. Under the dissent's reading, the state equal protection clause would impose no limits whatsoever on the state's employment practices, and the state would be free arbitrarily to exclude whole classes of citizens—e.g., the poor, the handicapped,

In the instant case, of course, the practice of excluding homosexuals from employment has allegedly been adopted not by the state itself but by PT&T, a public utility to whom the state has granted a monopoly over a significant segment of the telephonic communications industry in California. The constitutional question presented in this regard is whether the protection afforded individuals by the state equal protection clause encompasses protection against the discriminatory treatment alleged in the present complaint.

Article I, section 7, subdivision (a) of the California Constitution provides simply that: "*A person may not be* deprived of life, liberty or property without due process of law or *denied equal protection of the laws.*" (Italics added.) Unlike the due process and equal protection clauses of the Fourteenth Amendment, which by their explicit language operate as restrictions on the actions of states,[6] the California constitutional provision contains no such explicit "state action" requirement.

In *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 366-367 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266], however, in analyzing the reach of section 7, subdivision (a)'s predecessor provision, which similarly contained no explicit state action requirement,[7] our court explained that the history of the constitutional provision offered no suggestion that the provision was intended to apply broadly to all purely private conduct. In *Kruger*, we rejected plaintiff's suggestion that we interpret the constitutional provision as applicable without regard to any state action doctrine whatsoever.

---

unmarried persons—from employment opportunities without regard to such persons' fitness for the employment position in question. Past cases refute the dissent's novel assertion that the state equal protection clause has no application to employment discrimination engaged in or sanctioned by the state. (See e.g., *Sail'er Inn, Inc*, v. *Kirby* (1971), 5 Cal.3d 1, 15-22 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-24 [112 Cal.Rptr. 786, 520 P.2d 10].)

[6]Section 1 of the Fourteenth Amendment reads in relevant part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[7]At the time of *Kruger*, article I section 13 provided in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law."

At the same time, however, we were careful in *Kruger* explicitly to avoid any implication that the provision of the state Constitution at issue would in all instances be interpreted identically with the analogous provision of the federal Constitution.[8] ■ More recently, in *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 282 [146 Cal.Rptr. 208, 578 P.2d 925], we specifically stated that "in interpreting the scope of the due process clause under the state Constitution, we are not bound by federal decisions analyzing the state action requirement under the Fifth or Fourteenth Amendments . . . ." In like fashion, although our court will carefully consider federal state action decisions with respect to the federal equal protection clause insofar as they are persuasive, we do not consider ourselves bound by such decisions in interpreting the reach of the safeguards of our state equal protection clause. As article I, section 24 of the California Constitution explicitly declares: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."

■ In the instant case, the question with which we are presented is a narrow but important one: Is the California constitutional equal protection guarantee violated when a privately owned public utility, which enjoys a state-protected monopoly or quasi-monopoly, utilizes its authority arbitrarily to exclude a class of individuals from employment opportunities? As we explain, we conclude that arbitrary exclusion of qualified individuals from employment opportunities by a state-protected public utility does, indeed, violate the state constitutional rights of the victims of such discrimination.

In California a public utility is in many respects more akin to a governmental entity than to a purely private employer. In this state, the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities. (See generally Cal. Const., art. XII, §§ 1-9; Pub. Util. Code, *passim.*) Moreover, the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation. Both the prices which a utility charges for its products or services and the standards

---

[8]In *Kruger* we stated: "We by no means imply that the California due process clause must in all instances be interpreted identically with the due process clause of the Fifth Amendment. (See generally, Falk, *The State Constitution: A More Than 'Adequate' Nonfederal Ground* (1973) 61 Cal.L.Rev. 273, 282-286.)" (11 Cal.3d at p. 367, fn. 21.)

which govern its facilities and services are established by the state (Pub. Util. Code, §§ 728, 761); in addition, the state determines the system and form of the accounts and records which a public utility maintains and it exercises special scrutiny over a utility's issuance of stocks and bonds. (*Id.,* §§ 792, 816.) Finally, the state had endowed many public utilities, like PT&T, with considerable powers generally enjoyed only by governmental entities, most notably the power of eminent domain. (*Id.,* §§ 610-624.) Under these circumstances, we believe that the state cannot avoid responsibility for a utility's systematic business practices and that a public utility may not properly claim prerogatives of "private autonomy" that may possibly attach to a purely private business enterprise.

Moreover, we believe that PT&T's present claim—that it enjoys the power arbitrarily to exclude classes of individuals from its numerous employment opportunities without regard to constitutional constraints —is particularly untenable. ■ Protection against the arbitrary foreclosing of employment opportunities lies close to the heart of the protection against "second-class citizenship" which the equal protection clause was intended to guarantee. An individual's freedom of opportunity to work and earn a living has long been recognized as one of the fundamental and most cherished liberties enjoyed by members of our society (see, e.g., *Truax* v. *Raich* (1915) 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]) and, as one jurist has aptly noted, "discrimination in employment is one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for [oneself and] one's family in a job or profession for which he qualifies and chooses." (*Culpepper* v. *Reynolds Metal Company* (5th Cir. 1970) 421 F.2d 888, 891.)

■ For a number of reasons arbitrary discrimination in employment particularly flouts constitutional principles when it is practiced by a state-protected public utility. First, from the point of view of the individual seeking employment, both the injurious effect of arbitrary exclusion and the risk of such exclusion loom significantly larger in the case of a monopolistic or quasi-monopolistic public utility than in the case of an ordinary employer. An individual who is arbitrarily rejected by a single private employer is generally free to seek a job with that employer's competitors; if he is a qualified applicant, he may well have a good chance of gaining a position in his chosen field of employment

because of a private employer's desire to gain an advantage over its competitors and because of the employer's reluctance to permit its competitors to gain such an advantage. Arbitrary rejection from employment by a public utility with a state-protected monopoly such as PT&T, however, frequently leaves an individul no comparable option; since PT&T is the only company authorized to perform many telephone communications· services in much of the state, an individual whose occupation falls within PT&T's realm may have no alternative employer to whom he can turn. Moreover, because PT&T has no competition to fear, it does not face the inherent, if limited, check which the free market system places on employment discrimination. Thus, from the standpoint of the individual employee, the potential for employment discrimination by a public utility is high, and the effect of such discrimination when it occurs is devastating.

Second, unlike discrimination by a private employer, employment discrimination by a public utility can be particularly pernicious because, in light of the utility's position, the general public cannot avoid giving indirect support to such discriminatory practices. In the case of the ordinary private employer, members of the public who disapprove of the employer's employment discrimination can avoid supporting such a practice and attempt to eliminate it simply by refusing to purchase the employer's product or service. In the case of a public utility such as PT&T, by contrast, the necessitous service of the utility, not available through other enterprises, means that the general public lacks any choice but indirectly to support the utility's discriminatory practices. (See *United States* v. *New Orleans Public Service, Inc.* (5th Cir. 1977) 553 F.2d 459, 470.)

Finally, employment discrimination by a public utility is particularly incompatible with the values underlying our constitutional equal protection guarantee because a public utility's monopolistic or quasi-monopolistic authority over employment opportunities derives directly from its exclusive franchise provided by the state. For example, PT&T's monopoly over nearly 80 percent of the market for telephone service in California—and thus over tens of thousands of jobs—is guaranteed and safeguarded by the state Public Utilities Commission, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter these areas and which establishes rates for telephone service that guarantee PT&T a reasonable rate of return. (See Pub. Util. Code, §§ 1001, 1002, 726, 728.) Thus, to a

significant degree, the state has itself immunized PT&T from many of the checks of free market competition and has placed the utility in a position from which it can wield enormous power over an individual's employment opportunities. Under these circumstances, PT&T can point to no legitimate countervailing interest in "privacy" or "personal autonomy" which could reasonably justify exempting its discriminatory employment practices from constitutional constraints.

Accordingly, we conclude that in this state a public utility bears a constitutional obligation to avoid arbitrary employment discrimination.

Although, as we have noted, the federal decisions do not always provide an unfailing guide in this area, we believe that the relevant United States Supreme Court authorities are consistent with this conclusion. ██ As we shall see, those decisions have made it clear that when the state grants a private entity monopoly power over employment opportunities, the private entity—like the state itself—may not use such power in an unconstitutional fashion.

*Steele* v. *L. & N. R. Co.* (1944) 323 U.S. 192 [89 L.Ed. 173, 65 S.Ct. 226] is perhaps the seminal decision in this line of federal cases. In *Steele,* the Supreme Court faced the question whether a union which, under the terms of the Railway Labor Act, had been chosen the exclusive bargaining agent of all workers in a particular craft, could discriminate against black workers or whether it had a duty to represent fairly all workers for whom it bargained. The court below had held that the union, elected by a majority of the workers, owed no duty to members of a losing minority faction. The Supreme Court, however, reversed the lower court decision, noting that "[i]f . . . the Act confers this power on the bargaining representative of a craft or class of employees without any commensurate statutory duty toward its members, *constitutional questions arise.*" (Italics added.) (323 U.S. at p. 198 [89 L.Ed. at p. 181].)

As the Supreme Court pointed out, the exclusive bargaining agent status of the union, which we analogize to the exclusive state-granted franchise enjoyed by PT&T, provided the union with monopoly control over an individual's fundamental right to work. "[R]equiring carriers to bargain with the representatives so chosen, operates to exclude any others from representing a craft. . . . The minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own . . . . *Unless the labor union*

*representing a craft owes some duty to represent nonunion members of the craft . . . the minority would be left with no means of protecting their interests, or, indeed, their right to earn a livelihood by pursuing the occupation in which they are employed."* (Italics added.) (*Id.,* at pp. 200-203 [89 L.Ed. at pp. 182-183].)

Thus, because Congress had adopted a collective bargaining system under which the majority union was provided monopoly control over employment opportunities, the *Steele* court recognized that the union was not free to exercise its power arbitrarily or discriminatorily, but rather was obligated to avoid discrimination in its operations. (See also *NLRB* v. *Mansion House Center Management Corp.* (8th Cir. 1973) 473 F.2d 471; cf. *Bell & Howell Co.* v. *NLRB* (D.C. Cir. 1979) 598 F.2d 136.)

Subsequent to *Steele,* the high court has on numerous occasions recognized that unions which are afforded monopolistic control over employment by virtue of federal law may not violate the constitutional rights of their members with impunity. In *Lavoie* v. *Bigwood* (1st Cir. 1972) 457 F.2d 7, 13-14, Judge Coffin, in a scholarly opinion, traced the progression of Supreme Court cases from *Railway Employees Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714] to *Machinists* v. *Street* (1961) 367 U.S. 740, 749-750 [6 L.Ed.2d 1141, 1149-1151, 81 S.Ct. 1784] to *Lathrop* v. *Donohue* (1961) 367 U.S. 820 [6 L.Ed.2d 1191, 81 S.Ct. 1826], demonstrating that these cases, building upon *Steele,* establish the proposition that a private entity which, by virtue of state action, is afforded monopoly control over employment opportunities, is not free to exercise its power without regard to constitutional constraints. More recently, the Supreme Court emphatically reiterated this principle in *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209, 226, 234 [52 L.Ed.2d 261, 278-279, 283-284, 97 S.Ct. 1782].[9]

---

[9]Although PT&T, in arguing that no state action is present in this case, relies heavily on the United States Supreme Court decision in *Jackson* v. *Metropolitan Edison Co.* (1974) 419 U.S. 345 [42 L.Ed.2d 477, 95 S.Ct. 449], that decision is clearly distinguishable from the instant case. In *Jackson,* a public utility customer whose electricity service was terminated without notice or hearing claimed that the termination violated her rights under the due process clause of the federal Constitution. Although Justice Rehnquist, writing for the court majority, acknowledged that "[i]t may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics" (419 U.S. at p. 350-351 [42 L.Ed.2d at pp. 483-484]), the court ultimately held that the injury caused by the summary termination of service at issue was

In our view, the approach of these federal cases is clearly sound. Moreover, although the entity which enjoys a state-protected monopoly in this case is an employer rather than a labor union, we can discern no reason why that fact should immunize such entity from constitutional constraints. An individual who is arbitrarily excluded from a job suffers no less detriment, and no less "second class" treatment, when that discrimination is effected by the invidious practice of a state-protected employer than when it is implemented by a state-protected union.

Accordingly, we conclude that under the equal protection guarantee of the California Constitution a state-protected public utility may not arbitrarily or invidiously discriminate in its employment decisions. (Cf., e.g., *Weise* v. *Syracuse University, supra,* 522 F.2d 397, 403-408 (employment discrimination by private university found to constitute state action under federal Constitution); *Peper* v. *Princeton U. Bd. of Trustees* (1978) 77 N.J. 55 [389 A.2d 465, 476-478] (employment discrimination by private university held violative of state constitutional equal protection guarantee). See generally Tribe, American Constitutional Law, *supra,* at p. 1172.)

We emphasize that our holding in this regard in no way abridges a public utility's right to prefer the best qualified persons in reaching its hiring or promotion decisions. The equal protection clause prohibits only arbitrary discrimination on grounds unrelated to a worker's qualifications. ■ Thus, while we hold that the California Constitution

insufficiently related to the utility's monopoly status to warrant a finding of state action. (*Id.,* at pp. 351-352 [42 L.Ed.2d at pp. 484-485].)

Although the *Jackson* court's analysis on this point has been strongly criticized by a number of commentators (see, e.g., Tribe, American Constitutional Law (1978) at p. 1172; Note, *Supreme Court—1974 Term* (1975) 89 Harv.L.Rev. 139, 142-143; McCoy, *Current State Action Theories, The Jackson Nexus Requirement, and Employee Discharges By Semi-Public and State Aided Institutions* (1978) 31 Vand.L.Rev. 785, 807), we need not comment on the substantive merits of the *Jackson* decision, for it is clear that the arguably minor procedural due process violation at issue in that case is a far cry from the wholesale practice of employment discrimination allegedly undertaken by a state-protected public utility in the instant case. Numerous federal decisions have recognized that the federal courts have applied a different standard of state action in cases presenting procedural due process questions than has been traditionally applied in cases involving discrimination under the equal protection clause (see, e.g., *Weise* v. *Syracuse University* (2d Cir. 1975) 522 F.2d 397, 403-408; *R.I. Chapter, Assoc. Gen. Contractors* v. *Kreps* (D.R.I. 1978) 450 F. Supp. 338, 350, fn. 6 and cases cited), and there is absolutely no indication in the *Jackson* opinion that the court would similarly conclude that no "state action" existed if the management of a public utility utilized its monopoly power to enforce private prejudices against, for example, blacks, recent immigrants or homosexuals.

precludes a public utility's management from automatically excluding all homosexuals from consideration for employment positions—or, by the same token, from excluding any classification of persons because of personal whims or prejudices or any other arbitrary reason—we stress that the constitutional provision does not deny a public utility's management the authority to exercise legitimate judgment in employment decisions.

In the instant case, of course, plaintiffs have alleged that PT&T has adopted an arbitrarily discriminatory employment policy against homosexuals. In light of the foregoing analysis, we conclude that plaintiffs' complaint states a cause of action against PT&T under article I section 7, subdivision (a) of the California Constitution. (Cf. *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 390-397 [29 L.Ed.2d 619, 623-627, 91 S.Ct. 1999].)[10]

(b). *Section 453, subdivision (a) of the Public Utilities Code also prohibits a public utility from engaging in arbitrary employment discrimination.*

In addition to violating the provisions of the state equal protection clause, PT&T's alleged employment discrimination against homosexuals also violates the explicit statutory prohibition of discrimination by a public utility embodied in section 453, subdivision (a) of the Public Utilities Code. Consequently, we conclude that plaintiffs' complaint additionally states a cause of action against PT&T under section 2106 of the Public Utilities Code.

---

[10]PT&T maintains that by authorizing a direct court action in this case, we will inevitably undermine the elaborate administrative procedure established by the FEPA with respect to cases of public utility discrimination covered by the act. This contention has no merit. In view of our holding, *post,* that the FEPA does not encompass discrimination against homosexuals, we have no occasion directly to pass on the question of the procedure which properly governs a claim against a public utility that does fall within the aegis of the FEPA. We emphasize in this regard, however, that nothing in this opinion is intended to imply that an employee may pursue a claim for which a remedy is provided by the FEPA without exhausting the administrative remedies provided by that act.

As the dissenting opinion suggests, as a policy matter it may well be preferable for all employees who are the victims of illegal discrimination to be afforded an administrative remedy before the FEPC. As of yet, however, the Legislature has not granted the FEPC jurisdiction in cases arising out of non-FEPA, constitutionally proscribed discrimination. The absence of such an administrative remedy, however, provides no justification for the judiciary to fail to enforce individual rights under the state Constitution.

Since medieval times, the common law has imposed various obligations upon enterprises that exercise monopoly power to assure that such power is not exerted in an arbitrary or discriminatory manner. (See generally, Collier, A Treatise on the Law of Public Service Companies (1918) pp. 1-69 [hereafter Collier]; 1 Wyman, The Special Law Governing Public Service Corporations (1911) pp. 1-36 [hereafter Wyman].) Initially, common law courts justified such judicially imposed restrictions on the theory that the holders of monopoly power possessed their authority by virtue of a grant of power or license from the governing English crown. In order to retain the delegated right to exercise such power, monopolists were obligated to comply with an implied covenant that such authority be utilized for the good of the public weal and not be abused for personal motives or prejudices. (See, e.g., Collier, pp. 70-71.) Centuries later, this "royal privilege" doctrine evolved into a broad common law principle which placed numerous obligations, including an obligation to avoid discriminatory conduct, upon enterprises said to be "affected with a public interest." (See, e.g., *Munn* v. *Illinois* (1876) 94 U.S. 113, 125-130 [24 L.Ed. 77, 84-86]. See generally Collier et al., *The Origin of the Peculiar Duties of Public Service Companies* (1911) 11 Colum.L.Rev. 514-531, 616-638, 743-764; Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247.)

Although the outer boundaries of the "public service enterprise" category have not been precisely delineated, in contemporary times a public utility, such as PT&T, undoubtedly constitutes a paradigm example of an enterprise "affected with the public interest." Endowed by the state with a legally enforceable monopoly, and authorized by the state to charge rates which guarantee it a reasonable rate of return, such a public utility is capable of wielding enormous control over activities and individuals which fall within its realm, free from many of both the checks and hazards encountered by a competitive enterprise.

Having, by force of law, specifically guaranteed the public utility's monopoly status, the Legislature was not oblivious to the need to guard against the misuse of monopoly power. Drawing upon the well-established common law doctrine that a monopoly is not free to exercise its power arbitrarily, the Legislature enacted a specific and comprehensive statutory provision to prohibit discrimination by any public utility.

Section 453, subdivision (a) presently provides that: *"No public utility shall,* as to rates, charges, service, facilities, or *in any* other *respect,* make or grant any preference or advantage to any corporation or person or *subject any corporation or person to any prejudice or disadvantage."* (Italics added.) Although couched in general terms of "any" prejudice or disadvantage, the section, from the outset, has been interpreted, consistent with traditional common law principles, to prohibit only unjust or unreasonable differential treatment. (See, e.g., *Navarro Lumber Co.* v. *So. Pacific Co.* (1918) 15 C.R.C. 317, 318-319; *In re P.G.&E. Co.* (1920) 18 C.R.C. 201, 205-206; *In re Atchison, T. & S. F. Ry.* (1940) 43 C.R.C. 25, 33-34; *International Cable T.V. Corp.* v. *All Metal Fabricators* (1966) 66 Cal.P.U.C. 366, 382-383.) As so construed, the statute bans arbitrary discrimination by a public utility "in any . . . respect." On its face, of course, such language is clearly broad enough to preclude PT&T from engaging in arbitrary discrimination in the hiring, promotion, or termination of its employees as alleged in the instant case.

PT&T argues, however, that despite its broad language section 453 should not be interpreted as prohibiting a utility from engaging in arbitrary discrimination in employment matters. Instead, PT&T suggests that because state regulation of utilities primarily concerns the consumer-directed aspects of public utility operations, such as rates and services, section 453, subdivision (a) should be interpreted to proscribe discrimination only in the area of rates, services or other consumer-related functions and not to prohibit employment discrimination.[11]

---

[11]In advancing this argument, PT&T relies in part on a passage from this court's decision in *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441]. In that decision, the court held that while the PUC could refuse to permit a utility to pass excessive expenses on to ratepayers, the commission could not prescribe the actual terms of a contract between PT&T and its parent, American Telephone and Telegraph. (But cf. *Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 658-659 [128 Cal.Rptr. 881, 547 P.2d 993].) In the course of the *Pac. Tel. & Tel.* decision, the court stated in dictum: "[T]here is great public interest in the relations between labor and management, for wages invariably affect rates, and disputes over them or other matters are bound to affect services. . . . *In the absence of statutory authorization,* however, it would hardly be contended that the commission has power *to formulate the labor policies of utilities,* to fix wages or to arbitrate labor disputes." (Italics added.) (34 Cal.2d at p. 829.)

Although PT&T construes this passage as insulating all of a utility's employment policies from either PUC or judicial review, the *Pac. Tel. & Tel.* opinion clearly established no such all-encompassing barrier. In the first place, administrative or judicial inquiry into allegations of employment discrimination is a far cry from interference with the collective bargaining process contemplated in *Pac. Tel. & Tel.* Furthermore, the *Pac. Tel. & Tel.* dictum explicitly recognized that when statutory policies are implicated,

For a number of reasons, we do not believe that section 453, subdivision (a) can properly be interpreted, as PT&T proposes, as limited only to a prohibition of rate or service-oriented discrimination. As we explain, we believe that (1) the language of section 453, subdivision (a); (2) the provision's legislative history; (3) the evolution of the common law principle which the section codifies; and finally (4) the constitutional considerations discussed above, all indicate that the section should be interpreted to prohibit a public utility from engaging in arbitrary employment discrimination, such as alleged in the instant case.

*(1) Statutory language*

First, and perhaps most obviously, PT&T's proposed narrow construction of section 453, subdivision (a) is difficult to reconcile with the explicit broad language of the provision. As we have seen, the statute provides that "[n]o public utility shall, as to rates, charges, service, facilities *or in any other respect* . . . subject any . . . person to any prejudice or disadvantage." (Italics added.) The narrow interpretation of the section suggested by PT&T would fail to give full effect to the broad, emphasized language of the provision. As this court has noted on countless occasions: ▮ "It is a cardinal rule of statutory construction that in attempting to ascertain the legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning." (*Weber v. County of Santa Barbara* (1940) 15 Cal.2d 82, 86 [98 P.2d 492]; see, e.g., *Prager* v. *Isreal* (1940) 15 Cal.2d 89, 93 [98 P.2d 729]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; 2A Sands, Sutherland Statutory Construction (4th ed. 1972) § 46.06, p. 63.) ▮ The chosen language indicates that the Legislature intended to prohibit public utilities from engaging in arbitrary discrimination "in any respect," including employment discrimination.

*(2) Legislative history*

Second, the legislative history of the provision confirms the fact that the section's broad ban on discriminatory conduct was intended to reach beyond rate and service discrimination.

review of the utility's practices is entirely appropriate. Since the very issue in controversy here is whether or not section 453, subdivision (a) encompasses employment discrimination, PT&T's reliance on the *Pac. Tel. & Tel.* dictum obviously begs the determinative question in this case.

California enacted a statutory prohibition against "unjust discrimination" by a public utility in 1878, as part of one of the early state acts regulating railroad companies. (Stats. 1878, ch. 641, p. 969 et seq.) As defined in that early legislation, "unjust discrimination" related only to discrimination in rates and services;[12] the legislation did not broadly prohibit a utility from discriminating "in any other respect."

In 1909, however, the Legislature enacted a more comprehensive transportation regulatory scheme that placed considerably more restrictions on the activities of California public utilities. (Stats. 1909, ch. 312, p. 499 et seq.) The 1909 legislation contained two provisions, sections 33 and 34, which represent the predecessors of the current section 453, subdivision (a). Section 33 paralleled the provisions of the 1878 legislation, providing that a utility was guilty of "unjust discrimination" when it engaged in discriminatory practices with respect to rates or services. (*Id.,* at p. 511.) Section 34, however, went on to provide—in language that largely survives to this day in section 453, subdivision (a)—that "[*i*]*t shall also be unjust discrimination for any such* [*utility*] to make or give any undue or unreasonable preference or advantage to any particular person . . . *in any respect whatsoever* . . . or *to subject any particular person* . . . *to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.*" (Italics added.) (*Id.*)

Thus, the 1909 legislation, by setting forth the ban on unjust discrimination in two separate sections, clearly contemplated that the statutory prohibition on discrimination would reach beyond discrimination in rates and services; moreover, by stating the prohibition of discrimination in the broadest possible language ("in any respect whatsoever"), the legislation evidenced a clear intent to preclude *all* discriminatory practices by regulated utilities.

---

[12]Chapter 2, section 2 of the 1878 legislation (p. 983) provided:

"A railroad company shall be deemed guilty of unjust discrimination in the following cases:

"*First*—When it shall directly or indirectly willfully charge, demand, or receive from any person or persons any less sum for passage or freight than from any other person or persons (except as in this Act herein provided), at the same time, between the same places, and the same direction, for the like class of passage, or for the like quantity of goods of the same class.

"*Second*—When it shall directly or indirectly willfully charge, demand, or receive from any person or persons, as compensation for receiving, handling, storing, or delivering any lot of goods or merchandise, any less sum than it shall charge, collect, or receive from any other person for the like service, to a like quantity of goods of the same class, at the same place."

In 1915 the Legislature enacted a reorganized public utility statutory scheme consolidating sections 33 and 34 of the 1909 act into a single provision, section 19, which provided in relevant part: "No public utility shall, as to rates, charges, services, facilities or *in any other respect,* make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage." (Italics added.) (Stats. 1915, ch. 91, § 19, p. 127.) Nothing in the legislative history suggests that the 1915 Legislature intended to diminish a utility's obligation under the 1909 act to avoid arbitrary discrimination; section 19 continued the 1909 act's broad prohibition on discrimination "in any other respect." Since 1915, section 453 and its statutory predecessors have undergone occasional revision, but the statutory prohibition of a utility's discrimination "in any respect" has remained intact.

This legislative history demonstrates that section 453, subdivision (a)'s prohibition of utility discrimination may not properly be interpreted to apply only to discrimination as to rates or services. After initially enacting legislation that proscribed rate or service discrimination, the Legislature consciously broadened the statutory prohibition to bar utility discrimination "in any respect whatsoever"; the broadened prohibition has been repeatedly reenacted in revised utility regulatory schemes and is retained by the terms of section 453, subdivision (a) today. Under these circumstances, we cannot construe the section in violation of its literal language to exempt employment discrimination from its broad prohibition.[13]

*(3) Common law restrictions on discrimination by public service enterprises*

Third, the prohibition against discrimination in section 453, subdivision (a) finds its origin in the common law doctrine which restricted monopolistic power; accordingly, that section expressly condemned discrimination by the utility as to rates and service. But the common law

---

[13]In contending that section 453, subdivision (a) should not be interpreted to reach employment discrimination, PT&T points out that in 1972 two bills were introduced in the California Legislature which would have specifically added "employment" to the list of specifically enumerated items in section 453, subdivision (a), but that neither of the bills was enacted into law. (Assem. Bill No. 195 (1972 Reg. Sess.) § 2; Sen. Bill No. 333 (1972 Reg. Sess.) § 2.) Although in some circumstances such legislative inaction may represent a reliable indicant of the intended scope of existing legislation, the 1972 inaction upon which PT&T relies does not realistically shed any light upon the intended scope of section 453, subdivision (a) which, as we have seen, derives directly from legislation enacted in 1915.

doctrine is a dynamic one and it has developed to encompass discrimination in employment as well as in rates and service. That development gives further content and substance to the sweeping language of section 453, subdivision (a) which exorcises discrimination "in any respect"; pursuant to the thrust of the common law, that section thus covers discrimination in employment by a public utility.

Chief Justice Gibson's renowned opinion for a unanimous court in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], represents, of course, the seminal decision in this evolving line of common law authority. In *Marinship,* a union which had entered into a closed shop contract with Marinship Corporation refused to permit any black workers to join its Local No. 6 which negotiated contracts, handled grievances and dispatched workers to their jobs. Plaintiff, a skilled black worker who had been denied membership in Local No. 6, brought suit on behalf of himself and similarly situated black workers against both the union and the employer, seeking to enjoin the union's discriminatory practices and to prohibit the employer from giving effect to such discrimination. After a hearing, the trial court granted a preliminary injunction which both prohibited the union from "preventing the employment at Marinship of . . . Negro" workers and also enjoined the employer "from directly or indirectly discharging or refusing to employ or re-employ plaintiff and other Negro workers similarly situated."[14]

On appeal, defendants attacked the trial court's decision on the ground that the union, as a private voluntary association, retained the traditional common law right enjoyed by such associations to limit membership as the association saw fit. ▇ In *Marinship,* however, our court emphatically rejected the suggestion that a union with a closed shop agreement could be equated with an ordinary private voluntary association. Chief Justice Gibson declared: "Where a union has, as in this case, attained a monopoly of the supply of labor . . . such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from

[14]The injunction, insofar as it pertained to Marinship Corporation, read as follows:
"That defendant Marinship Corporation, its officers, agents, employees, and attorneys are hereby enjoined and restrained from directly or indirectly discharging or refusing to employ or re-employ plaintiff and other Negro workers similarly situated because they do not have or present a job or work clearance from, or are not members in good standing with the said International Brotherhood of Boilermakers, Local No. 6 thereof or auxiliary A-41, or any other auxiliary or subsidiary union or organization affiliated to said International Brotherhood of Boilermakers. . . ."

legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living." (25 Cal.2d at p. 731.)

As Chief Justice Gibson explained, a union's legal obligations under such circumstances flowed from the long-established common law doctrine, noted above, which prohibited the holder of monopoly power from using its power in an arbitrarily discriminatory fashion. Quoting from the decision of the New Jersey Court of Chancery in *Wilson* v. *Newspaper and Mail Delieverers' Union* (1938) 123 N.J.Eq. 347 [197 A. 720], *Marinship* emphasized that a " 'monopoly raises duties which may be imposed against the possessors of the monopoly. This has been recognized from earliest times. The rule that one who pursued a common calling was obliged to serve all comers on reasonable terms, seems to have been based on the fact that innkeepers, carriers, farriers, and the like, were few, and each had a virtual monopoly in his neighborhood. 17 Harv. Law. R. 156. A monopoly is under a common-law duty to charge only reasonable rates. . . . *The question in the instant case is not one of prices or of serving the public but one of employment. . . . However, the principle is the same; the holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others.* The nature of the monopoly determines the nature of the duty.' " (Italics added.) (25 Cal.2d at p. 732.) Since the local union enjoyed a monopolistic control of employment at Marinship, our court concluded that the trial court had, under common law principles, properly enjoined the union from exercising its authority in an arbitrarily discriminatory manner by excluding all blacks from membership. (25 Cal.2d at pp. 740-741.)

In a series of decisions subsequent to *Marinship* our court has invoked this common law principle to prohibit, in a variety of circumstances, discriminatory labor union policies which have arbitrarily excluded workers from employment opportunities. (See, e.g., *Bautista* v. *Jones* (1944) 25 Cal.2d 746 [155 P.2d 343]; *Williams* v. *Int. etc. of Boilermakers* (1946) 27 Cal.2d 586 [165 P.2d 903]; *Thorman* v. *Int. Alliance etc. Employees* (1958) 49 Cal.2d 629 [320 P.2d 494]; *Directors Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42 [48 Cal.Rptr. 710, 409 P.2d 934].)

Moreover, California courts have repeatedly recognized that the common law concept of "public service enterprise," articulated in

*Marinship,* does not in any sense extend only to the labor union. ■ In the past two decades, numerous California decisions have explicitly established that professional and business associations (*Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] [*Pinsker II*]; *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] [*Pinsker I*]; *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623 [114 Cal.Rptr. 681]; *Cunningham* v. *Burbank Bd. of Realtors* (1968) 262 Cal.App.2d 211 [68 Cal.Rptr. 653]; *Kronen* v. *Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289 [46 Cal.Rptr. 808]; *Swital* v. *Real Estate Commissioners* (1953) 116 Cal.App.2d 677 [254 P.2d 587]; cf. *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833]) and public and private hospitals (*Ezekial* v. *Winkley* (1977) 20 Cal.3d 267 [142 Cal.Rptr. 418, 572 P.2d 32]; *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 815 [140 Cal.Rptr. 442, 567 P.2d 1162]; *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 486 [131 Cal.Rptr. 90, 551 P.2d 410]; *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568]; *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592 [25 Cal.Rptr. 551, 375 P.2d 431]; *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507 [119 Cal.Rptr. 507]; *Wyatt* v. *Tahoe Forest Hospital Dist.* (1957) 174 Cal.App.2d 709 [345 P.2d 93]) are bound, under common law principles, to refrain from arbitrary exclusion of individuals from employment opportunities.

■ In the instant case, we need not directly decide whether California common law, in and of itself, prohibits a public utility from engaging in arbitrary employment discrimination; in the case of public utilities the Legislature has codified the antidiscrimination doctrine of the common law in section 453, subdivision (a) and has made it applicable "in any respect." That common law doctrine, as expressed in the *Marinship* line of authority, falls within the large compass of the sweeping inclusion of section 453, subdivision (a) and supports the proposition that the broad statutory language must be interpreted to include a prohibition of arbitrary discrimination as to employment. (Cf. *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 625 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *Baker* v. *Baker* (1859) 13 Cal. 87, 95-96. See generally 2A Sands, Sutherland Statutory Construction (4th ed. 1972) §§ 50.01, 50.02, pp. 268-275.) Certainly in adopting the broad statutory prohibition on utility discrimination, the Legislature did not intend to *free* public utilities from the common law proscriptions upon monopolies. (Cf. *Li* v. *Yellow*

*Cab Co.* (1975) 13 Cal.3d 804, 821-823 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].)

Although PT&T acknowledges that the *Marinship* line of decisions has applied common law restrictions on discrimination by public service enterprises to discriminatory restrictions on employment opportunities, PT&T suggests a number of factors to distinguish the past *Marinship* authorities from the instant case, distinctions which it claims should lead us to restrict the apparent scope of section 453, subdivision (a). As we discuss, however, none of the suggested distinctions will withstand analysis.

PT&T initially argues that the *Marinship* decision relates only to *racial* discrimination and does not apply to the discrimination against homosexuals alleged in the instant case. This characterization of the common law principle recognized and applied in *Marinship* is patently inaccurate. In *Bautista* v. *Jones, supra,* 25 Cal.2d 746, a companion case decided the same day as *Marinship,* we applied the common law principles of *Marinship* in affirming an injunction which prohibited a union with monopoly control over employment from arbitrarily excluding all self-employed milk distributors from membership; *Bautista* demonstrates beyond question that the common law restrictions on monopoly exclusion from employment extend beyond racial discrimination and reach all forms of arbitrary discrimination. Indeed, almost all of the post-*Marinship* decisions relate to exclusions based on grounds other than race. (See, e.g., *Thorman* v. *Intl. Alliance etc. Employers, supra,* 49 Cal.2d 629; *Directors Guild of America, Inc.* v. *Superior Court, supra,* 64 Cal.2d 42; *Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d 541.)

PT&T secondly maintains that neither the *Marinship* doctrine, nor the broad statutory language of section 453, subdivision (a), should be interpreted to prohibit arbitrary discrimination practiced by a utility in its capacity as an employer in light of the general common law rule that, in the absence of statute, an employer may hire or discharge employees as it sees fit. (See, e.g., *Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 167 [76 Cal.Rptr. 680]; *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880].) A principal fallacy in this argument, however, lies in the attempt to equate PT&T, a public utility enjoying a state-protected monopoly, with the ordinary private employer. As *Marinship* emphasized, a labor union with a closed shop agreement, though in form a private voluntary association, cannot properly claim the

same freedom from legal restraint as a private golf club or fraternal lodge; in similar fashion, the obligations of a public utility cannot be equated with those of an ordinary private employer. Having assumed the role of a public service enterprise, the management of a public utility must forego any prerogative to base its employment decisions on personal whim or prejudice; by virtue of its public service status, the public utility can claim no common law authority arbitrarily to exclude an entire class of individuals from employment opportunities without regard to such individuals' qualifications or fitness for the job. Indeed, the *Marinship* decision itself establishes that employers are not automatically exempt from these common law principles, for, as noted above, the injunction upheld in *Marinship* specifically prohibited the employer as well as the union from discriminating against black workers. (See p. 481, fn. 14 and pp. 483-484 *ante.*)

Accordingly, we believe that the general principles underlying the *Marinship* line of authorities support plaintiffs' contention that the provisions of section 453, subdivision (a) should be interpreted to prohibit employment discrimination by a public utility.

### (4) Constitutional considerations.

Finally, in addition to all the foregoing factors, the constitutional analysis set forth in section 2(a), *ante,* supports a construction of section 453, subdivision (a) that prohibits arbitrary employment discrimination by a state-protected public utility. It is true, of course, that section 453, subdivision (a) itself would not be unconstitutional even if it did not enact a statutory bar to all constitutionally prohibited discrimination; in some situations, the Legislature may well want to create differing statutory remedies for various constitutional violations. As we have seen, however, the language of section 453, subdivision (a) is broad and unrestricted and the legislative history suggests that the Legislature intended to impose general restrictions on discrimination by public utilities. Under these circumstances, we believe that the constitutional considerations discussed in section 2(a) constitute a strong basis for interpreting the existing statute as barring such discrimination.

In sum, in view of (1) the language of the statute, (2) the statute's legislative history, (3) the evolution of the common law principle which the section codifies and (4) constitutional considerations, we conclude

that section 453, subdivision (a) of the Public Utilities Code bars a public utility from arbitrarily discriminating in its employment practices.[15]

In light of our interpretation of section 453, subdivision (a), we conclude that plaintiff's complaint states a cause of action against PT&T under section 2106 of the Public Utilities Code. Section 2106 provides that any person who has been injured by an illegal public utility practice may institute a court action to recover monetary damages; since plaintiffs did seek monetary damages for PT&T's alleged illegal conduct, the action was properly instituted in court. (See, e.g., *Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 810-811 [117 Cal.Rptr. 423, 528 P.2d 31].) Moreover, under the circumstances of this case we believe that plaintiffs' request for injunctive relief can properly be maintained as ancillary to their damage action. (See *Vila* v. *Tahoe Southside Water Util.* (1965) 233 Cal.App.2d 469 [43 Cal.Rptr. 654].)

3. *Plaintiffs' complaint additionally states a cause of action against PT&T for interfering with plaintiffs' political freedom in violation of Labor Code sections 1101 and 1102.*

Over 60 years ago the California Legislature, recognizing that employers could misuse their economic power to interfere with the political activities of their employees, enacted Labor Code sections 1101 and 1102

---

[15]In *NAACP* v. *All Regulated Utilities* (1970) 71 Cal.P.U.C. 460, a case heavily relied upon by PT&T, the PUC declined to undertake a full-scale investigation of allegedly discriminatory employment practices of all regulated utilities, concluding that only the FEPC had jurisdiction over such employment discrimination. Recent actions by the PUC, however, raise considerable doubt as to the continued vitality of the *NAACP* ruling even within the commission itself, for despite the *NAACP* decision, on April 12, 1977, the commission on its own motion ordered an investigation of the employment practices of a significant number of public utilities to determine whether discriminatory practices exist and, if they do, whether such practices could lessen the efficiency of the utilities' operation or have other consequences related to the PUC's establishment of just and reasonable rates. (*Pacific Tel. & Tel. Co.* (1977) 82 Cal.P.U.C. 422; cf., *NAACP* v. *FPC* (1976) 425 U.S. 662 [48 L.Ed.2d 284, 96 S.Ct. 1806].)

Moreover, whatever the status of the *NAACP* ruling within the PUC, at least a portion of that decision should be disapproved. In the course of the *NAACP* decision, the PUC summarily dismissed a contention that section 453, subdivision (a) proscribed employment discrimination, simply noting that past cases interpreting the section had all involved discrimination in rates and services. (71 Cal. P.U.C. at pp. 463-464.) In concluding that section 453, subdivision (a) reached only rate or service discrimination, however, the *NAACP* opinion failed to consider the statutory language, the legislative history, the analogous common law authorities or the constitutional considerations discussed above. Accordingly, the decision's analysis of the scope of section 453, subdivision (a) is obviously faulty.

to protect the employees' rights. Labor Code section 1101 provides that "No employer shall make, adopt, or enforce any rule, regulation, or policy: (a) Forbidding or preventing employees from engaging or participating in politics . . . . (b) Controlling or directing, or tending to control or direct the political activities of affiliations of employees." ██ Similarly, section 1102 states that "No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."[16] ██ These sections serve to protect "the fundamental right of employees in general to engage in political activity without interference by employers." (*Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 335 [38 Cal.Rptr. 625, 392 P.2d 385]; see *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 486 [171 P.2d 21, 166 A.L.R. 701].)

These statutes cannot be narrowly confined to partisan activity. As explained in *Mallard* v. *Boring* (1960) 182 Cal.App.2d 390, 395 [6 Cal.Rptr. 171]: "The term 'political activity' connotes the espousal of a candidate *or a cause,* and some degree of action to promote the acceptance thereof by other persons." (Italics added.) The Supreme Court has recognized the political character of activities such as participation in litigation (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 429 [9 L.Ed.2d 405, 415-416, 83 S.Ct. 328]), the wearing of symbolic armbands (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]), and the association with others for the advancement of beliefs and ideas (*N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449 [2 L.Ed.2d 1488, 78 S.Ct. 1163].)[17]

---

[16]Although sections 1101 and 1102 refer only to "employees," identical terminology in the federal Labor Management Relations Act has been held to protect *applicants* for employment as well as on the job employees. (See, e.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 191-192 [85 L.Ed. 1271, 1281-1282, 61 S.Ct. 845, 133 A.L.R. 1217]; and *N.L.R.B.* v. *Mason and Hanger-Silas Co., Inc.* (8th Cir. 1971) 449 F.2d 425, 427.)

We cannot view the statutes as permitting employers to hire only members of the Republican Party, but forbidding them from firing members of the Democratic Party. Such an anomalous interpretation of these statutes would allow employers to thwart the legislative purpose of protecting citizens by merely advancing their discriminatory practices to an earlier stage in employee-employer relations. "Employers cannot be permitted to evade the salutary objectives of [a] statute by indirection." (*California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824].)

[17]Compare *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 561, [55 Cal.Rptr. 505, 421 P.2d 697] in which we held that Alameda County could not discharge an employee who refused to resign from an organization called the "Ad Hoc Committee to End Discrimination."

 Measured by these standards, the struggle of the homosexual community for equal rights, particularly in the field of employment, must be recognized as a political activity. Indeed the subject of the rights of homosexuals incites heated political debate today, and the "gay liberation movement" encourages its homosexual members to attempt to convince other members of society that homosexuals should be accorded the same fundamental rights as heterosexuals. The aims of the struggle for homosexual rights, and the tactics employed, bear a close analogy to the continuing struggle for civil rights waged by blacks, women, and other minorities. (See, e.g., *Gay Students Org. of Univ. of New Hampshire* v. *Banner* (1st Cir. 1974) 509 F.2d 652, 657; *Acanfora* v. *Board of Education of Montgomery County* (4th Cir. 1974) 491 F.2d 498, cert. den., 419 U.S. 836 [42 L.Ed.2d 63, 95 S.Ct. 64]; *Aumiller* v. *University of Delaware* (D.Del. 1977) 434 F.Supp. 1273, 1292-1302.)

A principal barrier to homosexual equality is the common feeling that homosexuality is an affliction which the homosexual worker must conceal from his employer and his fellow workers. Consequently one important aspect of the struggle for equal rights is to induce homosexual individuals to "come out of the closet," acknowledge their sexual preferences, and to associate with others in working for equal rights.

In light of this factor in the movement for homosexual rights, the allegations of plaintiffs' complaint assume a special significance. Plaintiffs allege that PT&T discriminates against "manifest" homosexuals and against persons who make "an issue of their homosexuality." The complaint asserts also that PT&T will not hire anyone referred to them by plaintiff Society for Individual Rights, an organization active in promoting the rights of homosexuals to equal employment opportunities. These allegations can reasonably be construed as charging that PT & T discriminates in particular against persons who identify themselves as homosexual, who defend homosexuality, or who are identified with activist homosexual organizations. So construed, the allegations charge that PT&T has adopted a "policy . . . tending to control or direct the political activities or affiliations of employees" in violation of section 1101, and has "attempt[ed] to coerce or influence . . . employees . . . to . . . refrain from adopting [a] particular course or line of political . . . activity" in violation of section 1102.

In *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481 [171 P.2d 21, 166 A.L.R. 701], our court established the principle that an

employee who has been discriminated against in violation of sections 1101 or 1102 may maintain a cause of action against his employer to recover damages sustained as a result of the employer's unlawful conduct. (See also Lab. Code, § 1105.) Thus, since the allegations of the complaint do allege that PT&T has engaged in conduct which violates these statutory provisions, the complaint also states a cause of action against PT&T on this ground.

4. *The California Fair Employment Practice Act does not encompass discrimination on the basis of homosexuality, and the trial court correctly refused to grant plaintiffs' request for a writ of mandate against the Fair Employment Practice Commission.*

The California Fair Employment Practice Act, in Labor Code section 1420, subdivision (a), prohibits discrimination on grounds of "race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex. . . ." The same enumeration of protected categories is repeated eight times in various sections and subdivisions of the act. (See Lab. Code, §§ 1411, 1412, 1419, subds. (f), (h), and (i); 1420, subds. (a), (b), (c).) The Legislature recently amended the act to prohibit discrimination against individuals over the age of 40 on the basis of age (Lab. Code, § 1420.1), and to prohibit school districts from discriminating against pregnant women (Lab. Code, § 1420.2). The act does not, however, explicitly prohibit discrimination on the ground of homosexuality or sexual orientation.

Plaintiffs nevertheless maintain that the act affords a remedy for such discrimination. They contend that the legislation should be construed to ban discrimination against homosexuals, either on the theory that the act bars all forms of arbitrary discrimination or on the theory that discrimination against homosexuals is "sex discrimination" within the meaning of the act.

Plaintiffs' contention that the act bars all arbitrary discrimination rests upon an analogy to the Unruh Civil Rights Act (Civ. Code, § 51) as construed by this court in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, ⁀74 P.2d 992]. Civil Code section 51 declared that all persons are entitled to equal accommodations in business establishments "no matter what their race, color, religion, ancestry, or national origin." In *Cox*, we viewed section 51 as a codification of the common law doctrine that a business affected with a public interest must serve all customers on reasonable

terms without discrimination. (See 3 Cal.3d at p. 212-213.) Construing the legislative enumeration of particular bases of discrimination as illustrative rather than restrictive, we interpreted section 51 to prohibit all arbitrary discrimination. (3 Cal.3d at pp. 215-216.) Plaintiffs urge us to adopt the same interpretation of the FEPA.

The defect in plaintiffs' argument, however, lies in the fact that whereas the Unruh Act represented a codification of the common law principle barring *all* discrimination by public accommodations in the provision of services, the prohibitions on employment discrimination contained in the FEPA are in no sense declaratory of preexisting common law doctrine but rather include areas and subject matters of legislative innovation, creating new limitations on an employer's right to hire, promote or discharge its employees. Under these circumstances, the rationale of *Cox* is inapplicable to the FEPA, and the specifically enumerated categories as to which discrimination is prohibited cannot be viewed as simply "illustrative." Indeed, the fact that the Legislature has repeatedly amended the FEPA in recent years, protecting successively the categories of sex (Stats. 1970, ch. 1508, § 4, p. 2995), age (Stats. 1972, ch. 1144, § 1, p. 2211; Stats. 1977, ch. 851, § 2, p. 2553), physical handicap (Stats. 1973, ch. 1189, § 6, p. 2501), medical condition (Stats. 1975, ch. 431, § 5, p. 925) and marital status (Stats. 1976, ch. 1195, § 5, p. 5461), affords a rather strong indication that the Legislature itself does not regard the original 1959 act as a bar to all forms of arbitrary discrimination.

Plaintiffs alternatively argue that discrimination against homosexuals constitutes discrimination on the basis of "sex" within the meaning of the FEPA. Plaintiffs point out that discrimination against homosexuals is in effect discrimination based on the gender of the homosexual's partner, and, analogizing to a series of racial discrimination cases,[18] plaintiffs assert that such discrimination is discrimination on the basis of sex. Although, as a semantic argument, the contention may have some appeal, we think, when viewed in terms of expressed intent, the Legislature, in proscribing discrimination on the basis of "sex," did not contemplate discrimination against homosexuals. Title VII of the 1964 Civil Rights

---

[18]Discrimination against a white person because he is married to or living with a black person has been held to constitute unlawful racial discrimination. (See *Loving* v. *Virginia* (1967) 388 U.S. 1, 11-12 [18 L.Ed.2d 1010, 1017-1018, 87 S.Ct. 1817]; *McLaughlin* v. *Florida* (1964) 379 U.S. 184, 192 [13 L.Ed.2d 222, 228-229, 85 S.Ct. 283]; *Langford* v. *City of Texarkana, Arkansas* (8th Cir. 1973) 478 F.2d 262; cf. *Aldred* v. *Duling* (4th Cir. 1976) 538 F.2d 637.)

Act, the federal counterpart of the FEPA, contains an identical prohibition on employment discrimination on the basis of "sex"; the federal courts that have addressed the issue to date have all concluded that this prohibition does not encompass discrimination on the basis of sexual orientation or homosexuality. (See *Voyles* v. *Ralph K. Davies Medical Center* (N.D.Ga. 1975) 403 F.Supp. 456, 457; *Smith* v. *Liberty Mutual Insurance Company* (N.D.Ga. 1975) 395 F.Supp. 1098, 1101. See also EEOC Dec. 76-75, CCH Emp. Prac. ¶ 6495 (1976) cited in Schlei & Grossman, Employment Discrimination Law (1976) p. 368.)

Moreover, the FEPC, the agency charged with administering the act, has since 1970—when the prohibition on discrimination on the basis of sex was added to the statute—consistently refused to accept jurisdiction over complaints charging discrimination based on sexual orientation. ▮ Such "[c]onsistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight . . . ." (*DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 61-62 [13 Cal.Rptr. 663, 362 P.2d 487].) ▮ Accordingly, we conclude that the FEPA's prohibition of discrimination on the basis of sex should not be construed to encompass discrimination on the basis of sexual orientation.

Plaintiffs argue, however, that despite the legislative history and administrative construction of the act, this court should nevertheless interpret the act to bar discrimination against homosexuals in order to preserve the statute's constitutionality. Plaintiffs contend, in this regard, that because the Legislature has afforded a statutory remedy against discrimination based on race, religion, sex, etc., homosexuals would suffer a denial of the equal protection of the laws if we were to construe the FEPA as withholding its protection from this alleged "discrete and insular minority." (Cf. *U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152, fn. 4 [82 L.Ed. 1234, 1241-1242, 58 S.Ct. 778].) Plaintiffs, however, cite no authority in support of the proposition that a remedial statute which affords a benefit to one or a number of historically aggrieved groups is unconstitutional if the same benefit is not afforded to all historically aggrieved groups.

Plaintiffs' position founders on the ruling in the United States Supreme Court case of *Katzenbach* v. *Morgan* (1966) 384 U.S. 641, 657 [16 L.Ed.2d

828, 839, 86 S.Ct. 1717]: "[T]he principle that calls for the closest scrutiny of distinctions in laws *denying* fundamental rights . . . is inapplicable [when the constitutional challenge relates only to] a limitation on a reform measure . . . . Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' . . ., that a legislature need not 'strike at all evils at the same time,' . . . and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' . . . ." (Italics in original.) Under these principles, the FEPA cannot be struck down as unconstitutional simply because the Legislature has declined to extend its remedies to all potentially aggrieved groups. (Cf. *Espinoza* v. *Farah Mfg. Co.* (1973) 414 U.S. 86 [38 L.Ed.2d 46, 94 S.Ct. 32].)

Accordingly, we conclude that the FEPA does not grant the FEPC jurisdiction to act on complaints charging employment discrimination on the basis of homosexuality. The trial court correctly upheld the FEPC's contention in this regard.

### 5. *Conclusion*

If this court were to accede to PT&T's sought sanction for its alleged arbitrary discriminatory practices, we would approve of a rule that would extend beyond the subject of employment discrimination against homosexuals. We would necessarily empower any public utility to engage in an infinity of arbitrary employment practices. To cite only a few examples, the utility could refuse to employ a person because he read books prohibited by the utility, visited countries disapproved by the utility, or simply exhibited irrelevant characteristics of personal appearance or background disliked by the utility. Such possible arbitrary discrimination, casting upon the community the shadow of totalitarianism, becomes crucial when asserted by an institution that exerts the vast powers of a monopoly sanctioned by government itself. We do not believe a public utility can assert such prerogatives in a free society dedicated to the protection of individual rights.

The judgment in favor of PT&T is reversed. The judgment in favor of the FEPC is affirmed.

Bird, C. J., Mosk, J., and Newman, J., concurred.

RICHARDSON, J.—I respectfully dissent. Prior to the majority decision, it had generally been assumed that a private employer had a free hand in adopting and implementing its own employment policies, so long as the employer complied with the antidiscrimination provisions of the Fair Employment Practices Act (FEPA) (Lab. Code, § 1420, subd. (a)). The majority herein concedes that FEPA is inapplicable here, for sexual orientation is not specified as one of the prohibited bases for discrimination in employment. Nonetheless, the majority, relying on certain constitutional and statutory provisions (Cal. Const., art. I, § 7; Pub. Util. Code, § 453, subd. (a); Lab. Code, §§ 1101, 1102) having no bearing whatever on the subject of the employment of homosexuals, concludes that plaintiffs' complaint states a cause of action on allegations that Pacific Telephone and Telegraph Company (PT&T) discriminated against "manifest homosexuals" in its hiring and promotion policies. In my opinion there is no sound basis for so holding.

### 1. *Equal Protection of the Laws*

The majority, relying upon the equal protection clause of the state Constitution (art. I, § 7), holds that a public utility such as PT&T has a *constitutional* obligation "to refrain from all forms of arbitrary employment discrimination." (*Ante*, p. 466.) Yet the majority cites no case whatever, and I have found none, suggesting, directly or indirectly, that a public utility, or any other private employer, is constitutionally mandated to ignore the manifest homosexuality, or any other physical trait or behavioral characteristic, of a job applicant or employee in making its employment decisions.

The majority apparently acknowledges that the due process and equal protection guarantees of our state Constitution (art. I, § 7, subd. (a)) protect only against *state action*, not private conduct. (See *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 281-282 [146 Cal.Rptr. 208, 578 P.2d 925]; *Kruger v. Wells Fargo Bank* (1974) 11 Cal.3d 352, 366-367 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266].) In *Garfinkle,* we unanimously declined to apply the due process provision of section 7 to measure the validity of a bank's nonjudicial foreclosure procedures, because such procedures did not involve or constitute state action. Similarly, in *Kruger,* we unanimously held that the due process provision did not apply to a bank's setoff of charge account debts against a depositor's checking account. We concluded in *Kruger* that "To construe article I, section 13 [now section 7], to apply to private action would

involve a judicial innovation which, as of this date, *is without precedent."* (P. 367, italics added.)

Nevertheless, the majority reasons that employment decisions made by PT&T constitute state action because "the state has granted [PT&T] a monopoly over a significant segment of the telephonic communications industry in California" (*ante,* p. 468), and also because "the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct . . ." (*ante,* p. 469). Accordingly, under the majority's analysis, the arbitrary exclusion of homosexuals from employment opportunities by PT&T constitutes state action which violates the equal protection provisions of article I, section 7, of the California Constitution. The majority's analysis is faulty in two respects.

a) *PT&T's Status As A Regulated Monopoly.*

First, for purposes of legal analysis, it is irrelevant that PT&T enjoys closely regulated monopoly power in the telephone industry. But for such power and regulation, the telephone communications business would be apportioned among a handful of competing *private* firms, each of which would have the right to hire, fire, promote and demote whomever they choose, subject only to the specific limitations of FEPA which, as the majority concedes, do not include discrimination based upon sexual orientation. Why should PT&T's regulated monopoly status automatically abrogate this freedom of choice?

Moreover, it cannot be fairly argued that PT&T's "monopoly" position in the industry extends to the area of employment opportunity. Although some PT&T technicians may work at specialized tasks not useful to other employers, surely most of its employees (including managerial, clerical and secretarial personnel, accountants, economists, lawyers and general technicians) enjoy more generalized skills. There is substantial and continuing movement of employees across the whole employment spectrum, public and private. As to these employment opportunities which is the critical relationship here, PT&T's "monopoly" control plays no role whatever. Accordingly, the state action principle should be wholly inapplicable to employment decisions affecting the substantial majority of PT&T personnel. Yet the majority opinion inexplicably seems to indicate that its equal protection holding shields *all* PT&T employees from "arbitrary" employment decisions.

b) *Applicability of Article I, Section 8.*

The majority stops too soon in its reading of article I of the state Constitution. It fails to appreciate the force and significance of the very next section, section 8, which immediately follows the general equal protection provision on which the majority relies. Section 8 provides that "A person may not be disqualified from entering or pursuing a business, profession, vocation, or *employment* because of sex, race, creed, color, or national or ethnic origin." (Italics added.) As is the case statutorily with the FEPA, it will be seen that conspicuously absent from the prohibition, constitutionally, is any reference whatever to *sexual orientation.* The implication is clear: A person has no *constitutional* right to challenge employment discrimination unless he or she falls within one of the categories specified in article I, *section 8.* Accordingly, the majority's reliance upon *section 7* is wholly misplaced. The specific subject of discrimination in employment is not covered by section 7 but by *section 8,* a provision equally applicable to private or public employers, and with the same omission as FEPA.

### 2. *Public Utilities Code Section 453, Subdivision (a)*

Section 453, subdivision (a), provides that "No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage." The majority urges that the foregoing language, read in the light of relevant legislative history, analogous common law principles and "constitutional considerations," includes by necessary implication a prohibition against discrimination in employment practices. Examining in turn each of the elements considered by the majority, I suggest that none of them justifies the majority's strained interpretation of the section.

a) *The Statutory Language.* On its face, it is readily apparent that section 453 is limited to the subject of discrimination against, or preference toward, a utility's *customers,* not its employees, as evidenced by the specific references to "rates, charges, service, facilities . . . ." Consideration of this issue invokes the familiar rule of statutory construction, *ejusdem generis,* which we have previously defined as follows: "It is the rule of construction that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same

general nature or class as those enumerated. [Citations.]" (*Pasadena University* v. *Los Angeles Co.* (1923) 190 Cal. 786, 790 [214 P. 868]; see also *Matter of Petition of Johnson* (1914) 167 Cal. 142, 145 [138 P. 740]; 2A Sutherland, Statutory Construction (4th ed. 1973) § 47.18 et seq.) Therefore, properly construed, section 453 prohibits discrimination or preference with respect to rates, charges, service, facilities and any other transaction *of the same general nature.* It must be concluded, accordingly, that, as a matter of proper statutory construction, employment policy as it relates to homosexuals, being a subject wholly unrelated to a utility's treatment of its customers, is beyond the reach of section 453.

The foregoing conclusion is entirely consistent with our own previous judicial interpretations in related areas. It is well established that, with exceptions not pertinent here, the courts and the Public Utilities Commission share concurrent jurisdiction over controversies involving alleged violations of the Public Utilities Act. (See Pub. Util. Code, §§ 735, 2106; *Vila* v. *Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 477-479 [43 Cal.Rptr. 654].) Thus, the majority's interpretation of section 453 necessarily will apply to proceedings before the commission, as well as to civil litigation. Yet, despite section 453's proscription against discrimination or preferences, we have long held that the commission lacks any authority to regulate a utility's labor policies. This principle was well expressed in *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822 [215 P.2d 441], by then Justice Traynor, who, writing for the majority, noted that ". . . there is great public interest in the relations between labor and management, for wages invariably affect rates, and disputes over them or other matters are bound to affect services. Accordingly there has been considerable state and federal legislation to diminish economic warfare between labor and management. *In the absence of statutory authorization, however, it would hardly be contended that the commission has power to formulate the labor policies of utilities, to fix wages or to arbitrate labor disputes.*" (P. 829, italics added.)

The fact that section 453 affords no "statutory authorization" to interfere with a utility's general labor practices under the foregoing principle of *Pac. Tel. & Tel. Co., supra,* is confirmed be a recent decision of the Public Utilities Commission, *NAACP, Western Region, et al.* v. *All Regulated Public Utilities* (1970) 71 Cal. P.U.C. 460. Complaints were filed with the commission alleging that defendant utilities engaged in discriminatory employment practices which excluded certain minority groups and females. As does the present majority, the complainants

relied in part on section 453 of the Public Utilities Code. The commission's decision explained, however, that although the commission possessed broad powers to regulate utilities *"vis-à-vis* the consumer, i.e., regulation of rates and services and the manner in which service is rendered in order to protect the ability to serve the public," the commission doubted that it possessed the power to regulate a utility's hiring practices. (*Id.,* at p. 462.) As for section 453, the commission noted that an examination of the cases interpreting that section "discloses that the conduct that is forbidden is in regard to discrimination in rates or service by the utility toward various groups or classes *of its customers* . . . . [N]o interpretation of . . . [§ 453] has been discovered which makes [it] applicable to the subject of minority hiring practices of utilities." (*Id.,* at pp. 463-464, italics added.) We denied issuance of a writ of review in the *NAACP* case, and properly so, but the majority herein now "disapproves" that case as "obviously faulty." To the contrary, any other interpretation of section 453 would violate the well recognized and controlling doctrine of *ejusdem generis,* discussed above. The majority's bending of the principle in this case ill serves the rational and logical development of the law.

I acknowledge that the commission has recently determined that its statutory authority to supervise the efficiency of operation and level of rates of a public utility permits it to inquire regarding a utility's alleged discriminatory employment practices, *but only insofar as they relate to utility efficiency or rates.* (See *Pacific Tel. & Tel. Co.* (1977) 82 Cal.P.U.C. 422, 423.) The foregoing commission decision does not rely, however, upon section 453, and the question of the commission's jurisdiction over employment discrimination which affects utility efficiency or rates is not presently before us.

b) *The Legislative History.* The majority attempts to support its interpretation of section 453 by resort to legislative history, but its own analysis of the predecessor sections of section 453 is wholly inconclusive. None of the prior versions of that section indicates any intent to include employment discrimination within the statutory proscriptions. Indeed, more recent legislative history conclusively establishes a contrary intent. Shortly after the *NAACP* decision became final in 1971, two bills were introduced in the 1972 session of the Legislature (Sen. Bill No. 333 and Assem. Bill No. 195) which would have amended section 453, subdivision (a), to include a prohibition against discrimination in "employment and promotional opportunities." The Legislature refused to enact these bills.

Quite clearly, this legislation was prepared to circumvent the holding of the *NAACP* decision. Equally clear, I suggest, is the legislative intent, in defeating these bills, to restrict section 453 to discrimination or preference *toward utility customers.* (See *Williams* v. *Industrial Acc. Com.* (1966) 64 Cal.2d 618, 620 [51 Cal.Rptr. 577, 414 P.2d 405]; *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 618 [7 Cal.Rptr. 129, 354 P.2d 657]; *Kirby* v. *Alcoholic Bev. etc. Appeals Bd.* (1975) 47 Cal.App.3d 874, 877 [121 Cal.Rptr. 572].) As observed in *Kirby,* a legislative intent to adopt or acquiesce in a particular administrative or judicial interpretation of a statute (such as the *NAACP* decision) becomes "unmistakably clear" when, as here, the Legislature subsequently has rejected bills aimed at changing that interpretation. (See also 2A Sutherland, Statutory Construction, *supra,* § 49.10, at pp. 261-262.) The majority elects to ignore these facts.

As noted above, one unfortunate effect of the majority's holding herein will be to enmesh the Public Utilities Commission in future disputes between disappointed applicants for employment or promotion within various public utilities throughout the state. Predictably and inevitably, the commission will find itself besieged with complaints from asserted victims of employment discrimination. Necessarily, the commission will be required to develop procedures to resolve these disputes. This will entail valuable commission resources consumed in hearing and determining matters in which the commission has neither experience nor expertise. The majority's decision makes no sense policy-wise.

The majority's thesis creates another anomaly, namely—homosexuals claiming to be victims of utility employment discrimination may obtain relief from the Public Utilities Commission; every other victim of claimed discrimination must follow the procedures of the Fair Employment Practices Commission.

The applicable legislative history conclusively establishes an intent to limit section 453 to discrimination against, or preference toward, utility customers. Control of discrimination in public utility employment should be confined exclusively to the agency properly charged with and equipped to handle such responsibility, namely, the Fair Employment Practices Commission.

c) *The Common Law Authorities.* The majority attempts to bolster its expansive reading of section 453 of the Public Utilities Code by reference to what it terms "analogous common law authorities," primarily *James* v.

*Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. In *Marinship,* we held that by reason of its monopoly over the supply of labor, a labor union may not arbitrarily exclude blacks from membership. The *Marinship* doctrine did not involve, nor was it fashioned to control, the employer's own independent decision whether to hire or fire particular employees. Instead, *Marinship* and the subsequent cases cited by the majority, prohibit discriminatory membership practices in such "monopolistic" employee organizations as labor unions, guilds, professional societies and hospitals, which stand as obstacles to future employment *with others.*

The majority speculates that section 453, "codified" the common law doctrine expressed in *Marinship.* This cannot be true, however, for it ignores history. *Marinship,* the first case to deal with labor discrimination, was decided in 1944, long after the pertinent language of section 453 was adopted. Moreover, as noted above, section 453 is entirely silent on the subject of a utility's labor practices and makes no mention whatever of the "monopoly power" requirement of the *Marinship* doctrine. Does the majority seriously suggest that section 453 applies only to those utilities having monopolistic control over the labor market? If, as the majority insists, *Marinship* is the controlling "common law authority," then presumably the majority's holding herein would be inapplicable to those smaller, independent utilities which *lack* such monopolistic control over labor. The majority cannot have it both ways.

The majority needs not struggle so to find the applicable common law principle for it is both very clear and very well established. Recently speaking for our unanimous court, and quoting from 9 Williston on Contracts, Justice Sullivan wrote: " '[T]he courts have not deemed it to be their function, in the absence of contractual, statutory or public policy considerations, to compel a person to accept or retain another in his employ . . . .' [§ 1017, p. 134.]" *(Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 727, fn. 12 [73 Cal.Rptr. 213, 447 P.2d 325]; *Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 167 [76 Cal.Rptr. 680]; *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880].) Thus, as a general common law proposition, an employer can hire or fire whomever he pleases, with or without cause, and regardless of the apparently arbitrary nature of his decision in a particular case.

By reason of the enactment of FEPA and its specific anti-discrimination provisions, the foregoing traditional common law rule has been substantially modified in respects not pertinent here. As the majority explains, FEPA now protects certain enumerated classes from arbitrary discrimination in employment practices. The legislative intent to exclude homosexuals from the protections of FEPA was made clear by the Legislature's rejection in 1975 of proposed legislation (Assem. Bill No. 633) which would have added "sexual orientation" to the act. The Legislature took this action for reasons satisfying to itself. Similarly, in 1978 Senate Bill No. 2053, which would have forbidden employers from discriminating against workers because of "sexual preference for any adult person," was abandoned by its author. The appropriate battleground for resolution of this issue is Sacramento. By virtue of today's decision the majority has elected to impose what the Legislature specifically and very recently refused to impose. With all due respect, I must suggest that this is "judicial legislation" in its purest form.

d) *The "Constitutional Considerations."* Finally, the majority refers back to its reliance upon article I, section 7, of the California Constitution as justifying its tortured interpretation of section 453 as applying to discrimination in employment. As I have noted, no case has ever held that a public utility or any other private employer is constitutionally compelled to ignore the manifest homosexuality of a job applicant or employee in making its employment decisions.

3. *Labor Code Sections 1101 and 1102*

The majority holds that the present complaint states a cause of action against PT&T for abridging plaintiffs' *political* freedom. Labor Code section 1101 prohibits an employer from "(a) Forbidding or preventing employees from engaging or participating in politics . . . . [¶] (b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees." Section 1102 prohibits an employer from coercing or influencing his employees by threat of discharge "to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

The majority's reliance on these sections is invalid, and the very fact that it makes the attempt betrays the fundamental weakness of its legal position. It is readily apparent that the complaint herein fails to allege *any* attempted control or coercion by PT&T of any employee or applicant

with respect to any *"political"* activity whatever. Significantly, plaintiffs' appellate briefs do not even raise the point. They cite neither section 1101 nor 1102 in support of their complaint. The "political" argument has never been advanced nor apparently even thought of by either lawyers or litigants.

The gist of plaintiffs' allegations in the complaint herein is that plaintiffs have been damaged by reason of PT&T's alleged refusal to hire or promote "manifest homosexuals." As the "introduction" to the first amended complaint alleges, "PT&T has, since at least 1971, had an articulated policy of excluding homosexuals from employment opportunities with its organization." Again, in the "fact allegations" of the complaint, it is alleged that ". . . PT&T has maintained and enforced a policy of employment discrimination against homosexuals . . . . PT&T refuses to hire any 'manifest homosexual' which [*sic*] may apply to it for employment at any occupational level or category." Nowhere in the complaint, from. beginning to end, do plaintiffs allege that PT&T's asserted policy of discrimination is directed toward any of plaintiffs' *political* activity or affiliations. Rather, plaintiffs contend, and the gravamen of their complaint is, that employment discrimination is based solely on the overt and manifest nature of their sexual orientation itself.

4. *Conclusion*

I fully concur in the majority's concern toward homosexuals who have suffered the detriment, trauma, or indignity of employment discrimination. They are entitled to all of the rights, protections, and privileges of other citizens, no less and no more. In the contemplation of the law, homosexuals stand neither burdened by prejudice nor blessed with preference. Nonetheless, it is not our function to tell employers, large or small, whom to employ. Courts should not attempt to police general employment practices in the absence of some clear constitutional or statutory authority. Neither exists in the matter before us.

I would affirm the judgment in its entirety.

Clark, J., and Manuel, J., concurred.

The petition of respondent Pacific Telephone and Telegraph Company for a rehearing was denied July 25, 1959. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.