TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

|  |  |  |
|---|---|---|
| OPINION | : | No. 85-404 |
| of | : | <u>APRIL 30, 1986</u> |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| NELSON KEMPSKY<br>Deputy Attorney General | : | |

---

THE HONORABLE ART AGNOS, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following question:

Do Labor Code sections 1101 and 1102 prohibit a private employer from discriminating on the basis of homosexual orientation or affiliation?

CONCLUSION

Labor Code sections 1101 and 1102 prohibit a private employer from discriminating on the basis of homosexual orientation or affiliation.

ANALYSIS

For more than a decade, the homosexual community in California has strived by litigation and legislation for equality of treatment and equality of rights with the heterosexual community. The California Supreme Court has ruled that Labor Code

1

sections 1101 and 1102 protect employees who identify themselves as homosexual from reprisal by their employers. We are now asked whether those sections would be interpreted to prohibit a private employer from discriminating on the basis of homosexual orientation or affiliation.

Section 1101 provides:

"No employer shall make, adopt, or enforce any rule, regulation, or policy:

"(a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office.

"(b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees."

Section 1102 provides:

"No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

The prohibitions were originally enacted as a single section in 1915, and were recast by the Legislature in their present form in 1937.[1] The courts have usually interpreted the statutes as being intended to defend employees engaged in traditional political activity from reprisal by their employer. For example, in *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 485, the Supreme Court commented that the statute concerned activities related to or connected with the orderly conduct of government and the peaceful organization, regulation and administration of the government. The sections protect "the fundamental right of employees in general to engage in political activity without interference by employers." (*Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 335.)

The statutes were enacted by the Legislature pursuant to its power under Article XIV, section 1, of the California Constitution to provide for the general welfare of employees in order that there be suitable protection of health and safety, and so that peace and good order may be promoted through regulations designed to insure wholesome

---

[1] Stats. 1915, c. 38; Stats. 1937, c. 90.

conditions of work and freedom from oppression (*Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 296).

The most difficult interpretive issue regarding the statutes is the definition of which types of political action and affiliations are protected by the legislative shield against arbitrary action by a private employer.[2]  In 1979, the California Supreme Court was confronted with this issue in the case of *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.*, 24 Cal.3d 458.  In that lawsuit, four individuals and two associations asserted that the defendant company practiced discrimination against homosexuals in the hiring, firing and promotion of employees, and that the company's conduct violated, among other statutory provisions, Labor Code sections 1101 and 1102.

The court first determined that the protection for "political activities" could not be narrowly confined to partisan activity on behalf of a political party.  Reviewing decisions of the United States Supreme Court, it noted that participation in litigation, the wearing of symbolic armbands and the association with others for the advancement of beliefs and ideas had all been held to be political activities.  (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 429; *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503; *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449.)

Against this background of cases defining political activity in broad terms, the court concluded that the fight against discrimination on the basis of homosexuality was political in nature.  It held (24 Cal.3d 458 at 488):

"Measured by these standards, the struggle of the homosexual community for equal rights, particularly in the field of employment, must be recognized as a political activity.  Indeed the subject of the rights of homosexuals incites heated political debate today, and the 'gay liberation movement' encourages its homosexual members to attempt to convince other members of society that homosexuals should be accorded the same fundamental rights as heterosexuals.  The aims of the struggle for homosexual rights, and the tactics employed, bear a close analogy to the continuing struggle for civil rights waged by blacks, women, and other minorities."

---

[2] We concluded in 66 Ops.Cal.Atty.Gen. 486 (1983) that the federal and state constitutions compel the conclusion that a local public agency is barred from discrimination in its employment practices on the basis of sexual orientation.  This opinion concerns whether employers in the private sector may engage in arbitrary discrimination.

3

While the nature of the plaintiffs' allegations invited the Supreme Court to make a broad ruling on the issue of whether homosexual orientation was entitled to protection as a political affiliation, the court limited its decision to a more narrow holding, sufficient to resolve the case before it even though it left other questions open to the future. After reviewing the assertion that the defendant discriminated against "manifest" homosexuals and against persons who make "an issue of their homosexuality," it construed the complaint as charging that the company (*id*.):

". . . discriminates in particular against persons who identify themselves as homosexual, who defend homosexuality, or who are identified with activist homosexual organizations."

Viewing the complaint in that light, the court held that the allegations stated a cause of action for violation of sections 1101 and 1102.

The Supreme Court thus interpreted the statute as protecting those who identify themselves as homosexual, who defend homosexuality or who are identified with activist homosexual organizations. The court did not opine upon the rights of those who do not openly identify themselves as homosexual, and whether they are entitled to the same degree of protection against a policy which would subject them to discrimination on the basis of a belief as to their sexual orientation.

Nevertheless, the court briefly discussed one aspect of the political aspiration of the homosexual community for equal rights (*id.*):

"A principal barrier to homosexual equality is the common feeling that homosexuality is an affliction which the homosexual worker must conceal from his employer and his fellow workers. Consequently one important aspect of the struggle for equal rights is to induce homosexual individuals to 'come out of the closet,' acknowledge their sexual preferences, and to associate with others in working for equal rights."

We are now asked the question left unanswered by the Supreme Court in *Gay Law Students Assn.*: Are employees with a homosexual orientation or affiliation protected in the same manner as those who identify themselves as homosexual, who defend homosexuality or who are identified with activist homosexual organizations? While the issue is not entirely free from doubt, we believe that if the California Supreme Court was directly confronted with the issue, it would rule that Labor Code sections 1101 and 1102 protect employees from discrimination on the basis of undisclosed or suspected homosexual orientation in the same manner as they protect employees from discrimination on the basis of open homosexual identification.

4

Initially, we find it quite improbable that the Legislature could have intended that it would be permissible for an employer to discriminate against an employee on the basis of undeclared political beliefs, while at the same time the employer was prohibited from discriminating against an employee on the basis of openly expressed political views.

It is obvious that the Legislature has barred, for example, the discharge[3] of an employee who openly declares himself or herself to be affiliated with the Republican or Democratic Party by reason of that party association. We cannot imagine that the Legislature intended at the same time to grant permission to an employer to have a policy permitting discharge of employees on the basis of the employer's belief that an employee is a covert Republican or a secret Democrat.

It appears instead to have been the Legislature's judgment that political activities are not within the purview of an employer's legitimate interests, and that political activities or affiliations, whether private or public, should not be tolerated as the basis for employment decisions. In the context of the question we have been asked and the California Supreme Court's conclusion that homosexual identification is a political activity, we conclude that the Legislature's protection for political activity extends to those who have not made a public issue of their orientation as well as those whose stand is openly proclaimed.

This conclusion is consistent with the text of the relevant sections, which point with fair clarity in that direction. Section 1101 bars any employer from any policy "tending to control or direct the political activities or affiliations of employees." Section 1102 bars any employer from attempting to coerce or influence any employee "to adopt or follow or refrain from adopting or following any particular course of line of political action or political activity."

Returning to the analogy of employees with undisclosed affiliations with a political party, we can see that if an employer had a policy of discharging employees believed to be secretly associated with the Democratic Party, employees who were actually oriented in that direction would feel pressured to either declare themselves publicly as Democrats in order to secure the protection of Labor Code sections 1101 and 1102 for their political affiliation, or to declare themselves as Republicans in order to

---

[3] While we use the example here of discharge from employment, the protection of the statutes is broader. Section 1102 prohibits an employer from threatening discharge *or* loss of employment for political action. Any denial, deprivation or diminution of employment status or benefits would constitute a loss. (See *Gay Law Students Assn.*, *supra*, 24 Cal.3d at 487, n. 16.)

5

placate their employer.  Those whose private orientation was toward the Republican Party would feel a similar compulsion to convince their employer of their orientation.

In either case, the policy of the employer would coerce all employees to make a declaration of orientation one way or the other in order to secure the protection of the Labor Code.  The effect of the policy would be to force the company's employees into particular courses of political activity, irrespective of any preference to keep their orientation a private matter.

Remembering that the Supreme Court has defined open self-identification of homosexuality as a political act, we conclude that if an employer had a policy of discharging employees because the employer held a belief that the employee's personal sexual orientation was homosexual, that policy would tend to control or direct the political activities or affiliations of that employee and others as well.

We also believe that the Supreme Court has presaged the decision it would render if presented with the question we discuss here.  The court noted that an important aspect of the struggle for equal rights is to encourage homosexual individuals to acknowledge their sexual preferences. Interpreting the provisions of the Labor Code to permit employers to have a policy of discharging employees on the basis of the employer's beliefs concerning the sexual orientation of its employees would have a marked chilling effect upon the willingness of those employees to take the political action of declaring their sexual orientation.  If such an employment policy impacted the political choices of a company's employees -- and it seems a certainty that such a policy would have a substantial tendency to do so -- it would violate the letter and the spirit of the two Labor Code sections we have been discussing.

We conclude the Supreme Court would determine that the logic of the views it expressed in *Gay Law Students Assn.* leads inexorably to the conclusion that declarations and activities surrounding an employee's sexual orientation are matters of legitimate concern to the employee only, and that the Legislature has prohibited employers from adopting policies which would impact those choices.

Since the Legislature has banned discrimination against employees on the basis of their political views, activities and affiliations, and since the Supreme Court has defined self-identification of homosexual orientation as protected political action, the Supreme Court would also rule that a policy of discrimination against employees on the basis of beliefs as to their homosexual orientation is also prohibited by that legislation.

*****

6